## 138     606    ESTATE OF SAMUEL WOODBURN, DECEASED.

APPEAL BY JAMES MCMANNIS ET AL., TRUSTEES, FROM THE ORPHANS' COURT OF WASHINGTON COUNTY.

Argued October 22, 1890—Decided January 5, 1891.

[To be reported.]

1. In order that an election by a widow to take under the will of her deceased husband may bind her, it must be made with a knowledge both of her rights and of the relative values of the interests between which her choice is to be made; and this rule applies with especial force, when she is called upon to make her election soon after the husband's death.

2. Such an election, though made formally by writing under seal filed with the register of wills, will not be binding, if procured from a widow by the executors soon after the husband's death, she then being ignorant of her rights, and receiving no explanation thereof or of the effect of the paper; at least, if repudiated by her at once, upon ascertaining its effect.

3. When a testator, who has made a lease of his land for oil purposes, stipulating, as part of the consideration thereof, for the delivery to him of a definite part of the oil produced, bequeaths the income of his estate to life-tenants, such part of the oil produced after his death is income, to which the life-tenants are entitled absolutely.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, MCCOLLUM and MITCHELL, JJ.

No. 210 October Term 1890, Sup. Ct.; court below, No. 48 August Term 1889, O. C.

On September 23, 1889, upon petition of W. M. Mustard and James McMannis, executors of the will of Samuel Woodburn, deceased, the court below appointed *Mr. J. F. McFarland* auditor, to report, inter alia, a distribution of a balance remaining in the hands of said executors, as shown by their account filed and confirmed.

Statement of Facts.

The following facts were found by the auditor:

Samuel Woodburn died in April, 1889, having made a will, duly admitted to probate after his death, which in addition to directing the payment of his debts and appointing the account- ants his executors, provided as follows:

2. " I do give & bequeath to my wife (Mary Woodburn) the use of a one Third ($\frac{1}{3}$) interest in my estate (property per- sonal and real estate), to be paid to her yearly by my executors hereinafter named.

3. " The use of the remaining two thirds ($\frac{2}{3}$), I direct to be equally divided between my five children (John, William, Min- nie, Samuel and Susannah,) or their lawful heirs, during the lifetime of my wife (Mary Woodburn), to be paid yearly to their guardian or on maturity to each one individually.

4. " I further devise that at the death of my wife my pro- perty be equally divided between my five (5) children or their lawful heirs."

On April 29, 1889, the testator's widow executed a paper, accepting the provisions of the will, in the following form:

" I, the undersigned Mary Woodburn, widow of Samuel Woodburn, deceased, late of Hopewell township, Washington Co., Penna., hereby state that I have read the will of my said husband and know the contents thereof and the provisions therein made for me, and that I have chosen and elected and hereby do choose and elect to accept said provisions and to take and receive my share of my said deceased husband's es- tate under and according to the terms of said will, dated April 13, 1889, and probated in the register's office, Washing- ton Co., Pa., 23d April, 1889.

" Witness my hand and seal this 29th day of April, 1889.

" MARY WOODBURN, [Seal.] "

This paper, after its execution, was placed on file in the register's office. It had been prepared by the executors, or some one for them, and was presented by one of them to the widow for her signature, without any explanation of her rights. She did not know what the paper was when she signed it, and did not know its effect or purpose until after the first meeting before the auditor. At that meeting she was present, was called as a witness by the attorney of the accountants, and testified that she signed this paper, after having heard the will read and know-

ing what its provisions were. But, at the second meeting before the auditor, she filed with him the following notice, marked exhibit A, verified by her affidavit made before the auditor:

" To Joseph F. McFarland, Esq., auditor, etc.:

" Please take notice that I, the undersigned widow of Samuel Woodburn, dec'd, decline to take under the will of my deceased husband, notwithstanding the paper signed by me electing to take under the same. That, at the time of signing said paper, I was wholly ignorant of my rights under the law. That I was in no way conscious as to what my rights or interests under my husband's will were, the same never at any time having been by any one explained to me prior to signing said paper.

" MARY WOODBURN."

Samuel Woodburn, in his lifetime, made an oil- and gas-lease of one of his farms to T. J. Vandergrift, for the term of three years, " and as much longer as oil or gas is found in paying quantities," granting to the lessee the exclusive right to operate for petroleum and gas on said farm. The lessee was to pay to the lessor $500 in hand and $6,750 in sixty days from the date of the lease, and to deliver to the lessor the one eighth part of all oil produced from the premises. At the time of the testator's death, three producing oil wells had been drilled, under the lease, and a fourth was then drilling, which was producing at the date of the auditor's first sitting. The fund for distribution included the proceeds of oil, run into the pipe lines to the credit of the testator, as royalty, during the testator's lifetime, and sold after his death by his executors, amounting to $697.57 ; and also the sum of $2,463.77 as the proceeds of oil, run into the pipe lines after the testator's death, in pursuance of the lease, and sold by the executors before filing their account.

The executors, before the settlement of their account, paid to the widow $140 on account of her share of the estate, and took credit therefor in the account, as a payment on distribution to " Mary Woodburn, widow, as legatee."

Upon the facts so found by him, the auditor reported, inter alia, as conclusions of law : (a) that the will created an active trust in the executors; (b) that the oil run into the pipe lines during the testator's lifetime was personalty and part of the corpus of the estate, but that the oil so run after his death was

Auditor's Report.

to be treated as a part of the profit or income of the real estate, accruing while the land was in the hands of the executors, as trustees under the will, citing: Eley's App., 103 Pa. 307; Stoughton's App., 88 Pa. 201; Sanderson v. Scranton, 105 Pa. 469; 2 Bl. Com., 41; Holman's App., 24 Pa. 177; German v. German, 27 Pa. 118; distinguishing Duff's App., 21 W. N. 491; (c) that the widow was not bound by her first election, and her election to take under the intestate law, made before the auditor, was valid and effective, citing: Bradfords v. Kents, 43 Pa. 484; Kreiser's App., 69 Pa. 194; Bierer's App., 92 Pa. 266. He therefore reported a schedule of distribution accordingly.

Exceptions to the report of the auditor were sustained by the court, McIlvaine, P. J., in an opinion holding, inter alia, that the widow, having voluntarily and of her own free will once elected, in writing under her hand and seal, to accept the provisions of her husband's will, her power of election was exhausted, unless she could show that she was misled or deceived as to the provisions of the will or the extent of the estate; and that she could not change her election, against the objection and to the prejudice of the legatees, simply because she had become dissatisfied with her election as originally made, especially as the dissatisfaction evidently was the result of the proper construction of the will, she having been moved to repudiate her first election by reason of being informed that, under such construction, she would receive none of the money in the hands of the executors, but simply the income of the one third thereof. The opinion of the court stated, further, that as the widow had failed to appear and maintain her rights at the argument of the exceptions, the court inferred that she had become indifferent in the matter, in view of the finding by the auditor that the oil royalties, received since the testator's death, were income.

The report having been referred back to the auditor to prepare a schedule of distribution in accordance with the opinion, the auditor filed a second report, treating the widow as bound by her original election, distributing the proceeds of the oil produced after the testator's death among the widow and chil-

dren as income, and awarding the remainder of the fund to the executors, to be held by them as trustees under the will. The auditor, however, embodied in his second·report an explanation of his finding, in the first report, that the widow was not bound by her first election, as follows:

In his first report, the auditor found as a fact, that the widow had signed the paper accepting the terms of the will, but "did not know its effect or purpose until after the first meeting before the auditor." He relied upon the uncontradicted evidence of executor Mustard, the widow Woodburn, and her sworn statement, marked exhibit A. The executor, shortly after the testator's death, called upon the widow with the paper showing her acceptance of the terms of the will, but does not think he made any explanation of her rights under the will or under the law. He told her what it was for and she signed it. He further says that, at that time, he believed she took the same one third under the will, that she was entitled to under the intestate law. She says the executor explained to her that it was something relating to Mr. Woodburn's will; that he did not persuade her to sign that first paper; he just said it was a paper connected with the estate. The auditor believed that if she got any impression at all from executor Mustard, it must have been, that she was signing a paper which was to give her the same one third she would have taken under the intestate law.

In this ignorant condition of mind, the widow, a spectator at the first meeting of the audit, was called by the attorney for the executors, without previous notice, without any attorney for her being present, as if on cross-examination; and, after being interrogated about other matters in aid of the estate, and without seeing the acceptance paper she had signed, was asked several questions concerning it. To these she answered, "Yes." The evidence as reported in the notes of testimony was the language of the attorney, to which the widow passively assented.

While the widow was not deceived or misled positively or intentionally, yet she was passive in the hands of those in whom she was confiding. To the auditor it seemed that the woman was ignorantly assenting to what she did not comprehend, to what had never been explained to her; i. e., the effect and purpose of the election paper. At the second meeting of the

Opinion of Court below.

audit, she filed exhibit A, and testified that she never knew what the paper she had signed was, until two days prior to the second meeting of the audit. "As soon as I heard what the paper meant I expressed my disapproval of it." "I expected to get some of the estate as my own property."

Now, as the widow, under her first election under the will, got no part of either the personal estate or the realty, it appeared to the auditor that her act could not be called an act of choice, intelligently made; that she did not know the relative value of the properties between which she was empowered to choose, and that this state of ignorance existed until after her first appearance and testimony before the auditor. Furthermore, it did not appear before the auditor that the legatees or any one else were objecting to the widow's choice, made when she discovered that she was not entitled to receive the same one third under the will that she would get under the law. . . . .

The widow having excepted to the finding, in the auditor's second report, that she was bound by her first election and must take in accordance with the provisions of the testator's will, and the accountants having again excepted, inter alia, to the conclusion of the auditor that the money realized from the sale of oil produced after the testator's death was distributable as income of the estate, the court, McILVAINE, P. J., after argument, sustained the exception of the widow,[3] and dismissed the accountant's exception,[7] in the following opinion:

When this case was before us, on exceptions filed to the auditor's first report, we held that the widow was bound by her first election to take under the will of her deceased husband, for the reason that said election was voluntarily made and was evidenced by an instrument of writing duly signed, sealed and delivered to the executors who had acted upon it, and that she had failed to show any mistake, fraud or imposition in the execution and delivery of this written election; and, for the further reason that the widow had failed to appear at the argument of the exceptions and maintain her claim to a second election, when her right thereto was denied, as we then understood it, by those who were interested adversely to her. It now appears from the statement of counsel that no

*Arguments.*

one objects to the widow withdrawing her first election and to her electing to take under the intestate laws, except the trustees under the will who are also executors. Under these circumstances, we do not think it our duty to hold the widow to her first election. When none of the beneficiaries under the will object, we do not think either the court or the executors or trustees should do so.

On the questions of distribution raised by the petition of the executors herein, filed on Sept. 23, 1889, we are of opinion:

1. That the testator intended to create an active trust, and that his estate should be controlled by his executors until the death of the widow, the income thereof to be paid by them to the legatees named in the will, subject to the rights of the widow under the intestate laws of the commonwealth, she having elected not to take under her deceased husband's will.

2. That the oil produced from the testator's real estate before his death, is personal property and part of the corpus of the estate.

3. [That all the oil produced from the testator's real estate, under the lease executed by him, since his death, and that may hereafter be produced by further development while the widow lives, is part of the income of the estate and not part of the corpus thereof.] [5]

4. [That the widow, having so elected, is entitled to take and have of her deceased husband's estate, the share which is given her under and by the intestate laws of the commonwealth.] [1]

—A decree of distribution, in accordance with the opinion of the court, having been entered, the executors, as trustees under the will, took this appeal assigning for error, inter alia:

1, 5. The conclusions of the court enclosed in [ ] [1] [5]

3. The sustaining of the widow's exception. [3]

7. The dismissal of the appellants' exception. [7]

*Mr. T. J. Duncan* (with him *Mr. John Aiken*), for the appellants:

1. The widow is bound by her election to take under the will. There is no charge of fraud or deceit in procuring that election, nor even of persuasion or advice. With a full knowledge of all the facts, she voluntarily made her choice, the executors

made a partial payment on distribution upon that basis, and she should not now be allowed to recede from it. Having made a formal election, with knowledge of the facts, ignorance of the law at the time will not release her: Light v. Light, 21 Pa. 412; Cauffman v. Cauffman, 17 S. & R. 25; Wise v. Rhodes, 84 Pa. 403; Preston v. Jones, 9 Pa. 457. The cases cited by the auditor fall short of sustaining a right to revoke the election, upon the facts of this case.

2. It is conceded on all hands that the testator's will creates an active trust, gives to the widow and children, during its continuance, only the use or income of his property, and postpones distribution of the corpus of the estate until her death. The gifts of the use of interests in the estate do not carry to the legatees, during the life of the widow, the oil produced since the testator's death. Oil is a mineral and an integral part of the land in which it is contained: Stoughton's App., 88 Pa. 201; Funk v. Haldeman, 53 Pa. 248; § 1, act of May 1, 1861, P. L. 431; act of April 21, 1854, P. L. 437; Washburn on Real Prop., *87. Minerals in place may be conveyed by deed, and held by title distinct from the right to the surface: Caldwell v. Copeland, 37 Pa. 430; Sanderson v. Scranton, 105 Pa. 474; Washburn on Real Prop., *87.

3. The right granted to Vandergrift amounted to a sale of all the oil in the land, and invested him with the complete title to the oil in situ: Caldwell v. Fulton, 31 Pa. 483; Montooth v. Gamble, 123 Pa. 241; Delaware etc., R. Co. v. Sanderson, 109 Pa. 583; Sanderson v. Scranton, 105 Pa. 472; Scranton v. Phillips, 94 Pa. 22. Woodburn reserved no title to any part of the oil. At the time of its production it was all Vandergrift's, and Woodburn could have no ownership in any part of it until delivery thereof to him.

4. The fact that part of the consideration of the oil grant was payable in oil, instead of in money, and the time of its payment, whether before or after Woodburn's death, can make no difference as to its quality; in either case, as a part of the price of real estate sold, it belongs to the corpus of the estate: Stoughton's App., 88 Pa. 201; Duff's App., 21 W. N. 492. The term "royalty" is not used in the grant, and there is no reservation of any oil, as royalty or otherwise. The reasoning in Eley's App., 103 Pa. 300, and like cases, is therefore inapplicable.

*Mr. T. F. Birch* and *Mr. J. L. Judson*, for the appellee, were not heard.

OPINION, Mr. CHIEF JUSTICE PAXSON:

This record presents two questions, which may be briefly stated thus : (*a*) Was the widow of Samuel Woodburn, deceased, bound by her first election to take under the will ? and (*b*) whether the oil produced from the testator's real estate was a part of the corpus of the estate.

In regard to the first question, the auditor has found that the widow signed the paper electing to take under the will in ignorance of her rights; that in doing so she was ignorantly assenting to what she did not comprehend, to what had never been explained to her; that is, the effect and purpose of the paper. He says : " The executor, shortly after the testator's death, called upon the widow with the paper showing her acceptance of the terms of the will, but does not think he made any explanation of her rights under the will or under the law. He told her what it was for, and she signed it. He further says, that at that time he believed she took the same one third under the will that she was entitled to under the intestate law. She says the executor explained to her that it was something relating to Mr. Woodburn's will; that he did not persuade her to sign that first paper; he just said it was a paper connected with the estate. The auditor believed that if she got any impression at all from the executor, it must have been that she was signing a paper which was to give her the same one third she would have taken under the intestate law."

The law upon this point is settled. While there is no allegation that the widow was intentionally deceived or misled, yet the fact remains that she signed the paper in ignorance of her rights, without any attempt on the part of the executor to inform her of them, or of the effect of the paper to which he procured her signature. Indeed, he appears to have been ignorant upon the subject himself. The authorities are clear that nothing less than unequivocal acts will prove an election, and they must be done with a knowledge of the party's rights, as well as of the circumstances of the case. Nothing less than an act intelligently done will be sufficient. She should know, and, if she does not, she should be informed, of the relative

values of the properties between which she was empowered to choose; in other words, her election must be made with a full knowledge of the facts. The rule applies with especial force where the widow is called upon, as in this case, to make her election shortly after her husband's death: Anderson's App., 36 Pa. 492; Cox v. Rogers, 77 Pa. 167; Bierer's App., 92 Pa. 266.

In regard to the second question, the auditor has found that the testator, prior to his death, had leased his farm for oil purposes. The lessee was to pay $500 in cash, and $6,750 within sixty days from the date of the lease, and one eighth of all the oil produced. The lessee entered under the terms of this lease, and at the time of the testator's death there were three producing wells upon the premises, and a fourth well was being drilled. This last well was producing, at the date of the first meeting of the auditor. The oil in the pipe lines, to the credit of the testator at the time of his death, was sold by his executors for $697.57. No question arises as to this money. It was clearly a part of the corpus of the estate. The oil run into the pipe lines since testator's death was sold by the executors for $2,463.77. We are of opinion that this was a part of the income of the estate. It was so held by the auditor and the court below, and we think correctly. The right of a life-tenant to operate previously opened mines, and work the same even to exhaustion, cannot be questioned: Eley's App., 103 Pa. 303, and cases there cited.

> The decree is affirmed, and the appeal dismissed, at the costs of the appellants.