# Robert Odenwelder's Estate.   Elijah J. Richards' Appeal.

*Husband and wife—Contractual relation—Uberrima fides—Equity.*

Where a married woman has been induced to enter into an agreement
with her husband releasing her rights of dower and statutory exemption,
etc., in consideration of certain testamentary disposition to be made in her
favor, equity will interfere to prevent the enforcement of such agreement,
where the circumstances of the case fail to disclose uberrima fides which
the imperative mutual confidence of the marital relation demands.

All contracts between husband and wife impose a special duty as to full
disclosure, to a degree which has no place in the ordinary contractual rela-
tions.

*Married women—Release of statutory rights—Act of 1893.*

*Dubitatur:* Whether the act of June 8, 1893, P. L. 344, gives a married
woman the power to make a valid agreement with her husband releasing
her statutory rights under act of April 14, 1851.

Argued Dec. 9, 1895.   Appeal, No. 7, Nov. T., 1895, from
decree of O. C. Northampton Co., requiring the executor of

Robert Odenwelder, deceased, to make appraisement of personal property to the value of $300 for widow of said decedent. Before RICE, P. J., WILLARD, BEAVER, WICKHAM, McCARTHY, and ORLADY, JJ.   Affirmed.

On December 27, 1894, Sabina Odenwelder, widow of Robert Odenwelder, presented a petition praying for decree requiring the executor to appraise to her her statutory exemption. On the same day citation was awarded upon the executor to show cause why he shall not make the appraisement demanded and why said decree shall not be made.   The citation being served, on answer and replication filed, the case was referred to an examiner and was subsequently heard on petition, answer and proofs.

On July 16, 1895, the rule was made absolute in an opinion by SCHUYLER, P. J., who held that the act of June 8, 1893, P. L. 344, does not give a married woman the power to make a valid agreement with her husband releasing her right of statutory exemption in the estate of her husband (Reported in 4 Dist. Rep. 550).

The facts of the case are fully set out in the opinion of the Superior Court.

*Errors assigned* were, (1) concluding the agreement to be void; (2–3) in making the rule absolute and not dismissing the petition.

*Orrin Serfass* and *H. J. Steele,* for appellant.—The court below in making absolute the rule allowing the widow her exemption based its opinion upon the belief that a married woman does not possess the power to contract with her husband, under act of June 8, 1893.   In the numerous cases decided since the passage of this act the courts have given it the construction indicated in its title, viz: enlarging her capacity to acquire and dispose of property: Nuding v. Urich, 169 Pa. 289.   The express exception excludes all others: Brocket v. R. R. Co., 14 Pa. 241; Miller v. Kirkpatrick, 29 Pa. 226.   On this point also see 9 Am. & Eng. Ency. of Law, 793, 794.   The wife had the power to dispose of her expectant estate: Lawrence v. Bayard, 7 Paige, 70.   The contract in this case was clearly valid unless

it be shown that the husband plainly obtained an advantage in the contract by procuring an inequitable provision for his wife : Smith's App., 115 Pa. 319; Linten's App., 104 Pa. 228; Ludwig's App., 101 Pa. 535; Neely's App., 124 Pa. 406. The agreement could have been enforced against Mr. Odenwelder in his lifetime : Dillinger's App., 35 Pa. 357. The giving of the receipt was an express ratification : Brown v. Bennett, 75 Pa. 420; Trout v. McDonald, 83 Pa. 144.

*F. H. Lehr* and *W. S. Kirkpatrick*, for appellee.—Statutes like act of 1893 do not destroy the unity of husband and wife, and enable them to make contracts generally with each other enforceable at law. To this effect in the case of statutes worded similarly to ours, see Lord v. Parker, 85 Mass. 127; Knowles v. Hull, 97 Mass. 206; White v. Wager, 25 N. Y. 328; Haas v. Shaw, 91 Ind. 384; Carey v. Burruss, 20 W. Va. 571; Pillow v. Wade, 31 Ark. 678; Artman v. Ferguson, 73 Mich. 146; Board of Trade of Seattle v. Hayden, 4 Wash. 263.

Even if the contract were valid at law the circumstances attending on the making and the procuring of the signature of the wife are such as to make it inequitable against her and not available to defeat her right to the widow's exemption. This is especially true in view of the confidential and fiduciary relation : Darlington's App., 86 Pa. 512; Campbell's App., 80 Pa. 298; Kreiser's App., 69 Pa. 194; Miskey's App., 60 Pa. 107.

OPINION BY BEAVER, J., March 18, 1896 :

Robert Odenwelder, a widower with three children, aged forty-two years, wed Sabina Messinger, a widow with two children, September 22, 1877. The conjugal relation thus established continued for more than seventeen years, when, upon December 3, 1894, it was terminated by the death of the husband. Prior to the date of his death, two of the children of the first marriage had died, leaving Mary Richards, the wife of Elijah J. Richards, the appellant in this case, as the only surviving child. The decedent was also survived by his wife and the child of his daughter Elizabeth who had been intermarried with Edward W. Cole, and died April 9, 1886. There was no issue of the second marriage.

On the 25th day of September, 1894, Robert Odenwelder

made his last will and testament which has been duly probated in the office of the register of wills of Northampton county. By the terms of the said will he bequeathed unto his granddaughter, Catharine Cole, the sum of $100; unto his wife, Sabina, $1,000; and, in the event of her death prior to his, the sum of $1000 unto her children. He disposed of the balance of his estate as follows: "All the rest of my estate, real, personal and mixed, I devise and bequeath unto my executor, Elijah J. Richards, for the term of the life of my wife, Sabina, nevertheless in trust to maintain and invest the same and pay the net income thereof semi-annually as follows: two-thirds of said net income unto my daughter Mary and one-third of said net income unto my said wife, Sabina, for the term of her, my said wife's life. From and after the death of my said wife, I devise and bequeath all my said estate, real, personal and mixed, unto my daughter Mary absolutely and in fee. The bequests and devises above made for my said wife, both the One Thousand Dollars and the one-third net income, are to be received and accepted by her in lieu of her dower at common law and her interest and right under the intestate and exemption laws of Pennsylvania or elsewhere." Elijah J. Richards is named therein as the executor of the will.

On the 10th day of December, 1894, four days after the funeral of the decedent, Elijah J. Richards, his wife Mary and his attorney met at the house of Mrs. Odenwelder, Mrs. Richards having preceded the others. The will was opened and at that time, before its probate, Mr. Richards, the executor named therein, proposed to pay to Mrs. Odenwelder, the widow, $500, on account of the legacy therein bequeathed to her. The widow, after making some objection, finally yielded and he produced a receipt previously prepared, which she signed, which is as follows:

"Easton, Pa., December 10th, 1894.

"Received from Elijah J. Richards, Executor of Robert Odenwelder, Five Hundred Dollars, being in part payment of legacy of One Thousand Dollars bequeathed me by the will of said Robert Odenwelder, accepted by me in accordance with the terms of said will and the terms of agreement of September 25th, 1894, between Robert Odenwelder, Mary Richards and myself. "$500.00. SABINA ODENWELDER."

The will was probated subsequently upon the same day. Two days thereafter, to wit, on the 12th day of December, 1894, the widow, having taken counsel in the meantime, had prepared by her attorney a notice which is as follows:

"SIR :—You have paid me or deposited for me the sum of Five Hundred Dollars and, at your request, I have signed a receipt, without knowing its meaning or effect. I am now informed that you claim its receipt by me affects my right to the sum of Three Hundred Dollars, as the widow of my late husband, as well as my right of choice to take under the intestate laws of this State, instead of under my husband's will. I have, therefore, placed in the hands of my attorney, F. H. Lehr, my check on the Northampton County National Bank for the Five Hundred Dollars there deposited by you for me, to be delivered to you, upon the return of said receipt to him or to me. At the same time I ask to have appraised to me the sum of Three Hundred Dollars allowed to me as widow under the laws of Pennsylvania."

This notice was served upon the executor prior to the appraisement of the personal property. It was disregarded by him ; no property was set apart to the widow, as requested ; and, after a subsequent notice,—specifying certain personal property which she elected to take at its appraised value as part of her claim for $300 and that the balance of the amount of $300 would be selected when she had an opportunity of seeing the balance of the inventory; to which the executor on the 26th of December, 1894, replied that according to the terms "of your husband's will and your agreement of September 25th last, I am not permitted to allow your claim of the exemption of Three Hundred Dollars etc,—" she presented her petition December 27, 1894, to the orphans' court, praying for a decree, requiring the executor to appraise to her her "statutory exemption." On the same day a citation was awarded upon the executor to show cause why he should not make the appraisement demanded and why said decree should not be made. This citation was answered by the executor, a replication was filed, an examiner was appointed to take testimony, and the court, after argument, on the 16th of July, 1895, granted the petition in an opinion duly filed. From this decree the executor has appealed to this court.

If there were nothing in this case, except the will of the testator and the receipt given by the widow at the time when the will was read to her, there would be little difficulty in reaching a conclusion. We would be bound to hold, under the well settled law of this state, recently restated in Woodburn's Estate, 138 Pa. 606, and Peeble's Estate, 157 Pa. 605, that the widow's right to take $300 from the personal estate of the decedent was not affected by the will or the supposed election to take thereunder implied by the receipt of the 10th of December, 1894, the said supposed election having been made soon after the husband's death and before she had been advised as to her rights under the law; the later authority of Peeble's Estate going so far as to determine that in such case the election of the widow to take under the will did not in any manner interfere with her claim under the exemption law.

It is alleged by the appellant, however, that the widow is precluded from making this claim by virtue of an agreement in writing, under seal, made upon the 25th day of September, 1894, on the same day although subsequently to the making of the will of the decedent, in and by which she agreed to and with her husband and Mary A. Richards, in consideration of the making of the said will and of other covenants in the said agreement contained, as follows, to wit: " to receive and accept said bequests and devises in lieu of her dower at common law in the estate of her said husband and her share, portion or interest in the same, under the intestate and exemption laws of the Commonwealth of Pennsylvania or elsewhere." The agreement further provides as follows: " And the said Sabina doth remise, release and forever quit-claim unto the said Robert Odenwelder and said Mary Richards, his and her heirs, executors and assigns, and all other persons whomsoever whatever their status or interest in said estate under the will of said Robert Odenwelder may be, all and all manner of dower and right and title of dower and other interest, right or title whatsoever at common law or under the intestate and exemption laws of Pennsylvania or elsewhere, which the said Sabina may now have or might, should or of right ought to have or claim, as the wife or widow of said Robert, of, in, to or out of his estate, excepting such right or interest as is hereby agreed by said Robert to be devised and bequeathed to said Sabina by his

last will and testament, so that neither she, the said Sabina, nor any other person or persons whatsoever for her or in her name, right or stead, any manner of dower or interest under the intestate and exemption laws of Pennsylvania or elsewhere, in or out of the said estate of said Robert Odenwelder being deceased, or any parcel thereof, shall or may have, claim or prosecute against her, the said Mary Richards, her heirs or assigns, or any other person or persons whatsoever."

If the widow is bound by the terms of this agreement made in her husband's lifetime, she cannot, of course, prevail in her claim to have her statutory right of $300 set apart to her out of the personal property of her husband, under the provisions of the fifth section of the act of the 14th of April, 1851.

The consideration of this question opens a wide and interesting field of inquiry: First. Has a married woman during her coverture the power to make a valid agreement with her husband, by which she can voluntarily release her statutory right to $300 to be set apart to her out of his estate after his death? In other words, was the agreement of the 25th of September, 1894, hereinbefore recited, void in law? And second. Even if it were not void, should not equity interfere to prevent its enforcement, in view of all the circumstances of the case?

It is conceded that, if the power to make the agreement above referred to exists, it is conferred by the act of the 8th of June, 1893, entitled "An act relating to husband and wife, enlarging her capacity to acquire and dispose of property, to sue and be sued, and to make a last will and enabling them to sue and to testify against each other in certain cases."

In our view of the case, it is not necessary for us to discuss the first proposition above named, namely, as to whether or not the agreement of the 25th of September, 1894, is actually void, inasmuch as we are clearly of the opinion that it should be voided in equity. The question as to whether or not the act of the 8th of June, 1893, confers upon a married woman during her coverture the authority to barter and sell for any consideration the personal privilege given to her under the act of the 14th of April, 1851, is a question of very great importance to the community and should be carefully considered and decided when a proper case arises. We do not consider it now, for the

reason that the case under consideration presents another phase upon which our decision may safely and soundly rest.

The second proposition, namely, "Should equity interfere to prevent the enforcement of the agreement referred to, in view of all the circumstances of the case?" embraces the second and third assignments of error. A great mass of testimony bearing upon this question has been taken and submitted to us, which has been very carefully considered. The attorney of the husband 'or of his son-in-law and an officer to take the acknowledgment appeared at Odenwelder's house without notice to the wife, who admits them under the impression that one of them is the pastor of her husband, who comes to visit him in the capacity of spiritual adviser. She has no knowledge of the object of the visit, until they and the husband make their appearance in the room where she is entertaining callers. A paper previously prepared is read to the wife which she declines to sign. A suggested change is made by one of the visitors who does not in any way represent the wife. She is there without any adviser. The husband is sick and irritable, the wife nervous and apprehensive. There can be no question whatever that the condition of the husband was used by those who were interested in having the paper signed to influence the wife in assenting to and signing it. The weight of the testimony strongly indicates that, although the paper was read in the hearing of the wife, it was not explained to her in such a way as to enable her to understand it. There was no examination separate and apart from her husband. The weight of the testimony is overwhelming that he remained in the room near to her person whilst it was executed and the acknowledgment taken by the officer. Leaving the testimony of the widow and those most directly interested in the subject out of view, the testimony of William Odenwelder, who was entirely disinterested and went there as the friend of Robert Odenwelder, bears upon this question. When the subject of the signing of the agreement was under consideration, he says, in his examination:

Q. What did Robert say? A. Robert came and set right alongside of me. "William," he says, "here I have something on my mind that I want to get rid of; something that I want to have fixed."

Q. Did he talk loud enough for all in the room to hear him?

A. Oh, yes, we were all sitting around. Q. Mrs. Odenwelder too ? He said, " Now William, here is something "— A. Yes, " that I want to get off my mind; " that he wanted to tell me what he wanted to do. He said Sabina would be a great deal better off if she would do it—if she would sign it. Mr. Serfass and Mr. Fenicle said that she would be a great deal better off and that they thought it was a great deal of the cause of Robert's sickness. Q. Who said that? A. Mr. Fenicle and Mr. Serfass said that, and then Robert told me what he intended to do. I suppose you know what that is—the will and about the thousand dollars."

Leaving out of view what is alleged to have been said as to the testator's intention to transfer all his personal property, in case his wife refused to sign the agreement, it is very evident that she was influenced rather by her desire to secure the peace of mind and the possible restoration to health of her husband than by sordid considerations. This she herself distinctly asserts in her testimony. There is no question whatever as to the positive disinclination of Mrs. Odenwelder to sign the agreement. That disinclination was in some way overcome,—not perhaps under duress per minas. There is a duress, however, quite as strong and quite as effective which will influence any good, womanly wife, and seems to have been the compelling cause in this case—duress per amorem. Did Mrs. Odenwelder understand the contents of the paper which she signed? We cannot believe, from the testimony, that at the time of the making of the agreement, she understood that she was surrendering her right to have $300 from the estate of her deceased husband set out to her, after his death. This is the only part of the agreement with which we have to do, and we confine our inquiry entirely to it. William Odenwelder, a man of ordinary, if not more than ordinary, intelligence, did not so understand it from the reading of the agreement at the time, nor did he understand it from the reading of the agreement in his hearing at the time at which his testimony was taken. Although the terms " widow's exemption " and "rights under the exemption law " have crept into our legal parlance, the original act does not purport to be in terms an exemption law. It provides that " hereafter the widow or the children of any decedent dying within this commonwealth testate or intestate may re-

tain from real or personal property belonging to said estate to the value of Three Hundred Dollars, and the same shall not be sold but suffered to remain for the use of the widow and family. " The mode of appraisement provided in. the act of the 9th of April, 1849, entitled " An Act to ·exempt ' property to the value of Three Hundred Dollars from levy and sale on execution and distress for rent" is referred to and made part of the machinery for securing this right to the family. Probably for this reason and also because as against creditors the right of the widow and children becomes practically an exemption, the name commonly applied, at least in legal parlance to this right of the widow and children, has been called " the widow's exemption. " It is doubtful whether it is so understood in common parlance. The most disinterested person in the interested group which assembled in the dining room of Robert Odenwelder at the time of the execution of this agreement certainly did not so understand it, and the widow was evidently surprised after the death, to find that she was not to have her $300 set aside to her; and, in order to satisfy her, it was necessary to assure her that she was much better off by the bequest of $1,000 than if she had been left to her statutory rights. Any unprejudiced reading of the testimony in this case must inevitably lead to the conclusion that the wife was not only unwilling to sign the agreement at the time it was executed but. that she did so in ignorance of the fact that she was surrendering her right to have $300 of the property of her husband set aside to her under the statute. The general principle of O'Nail v. Craig, 56 Pa. 161, is applicable here. It is claimed, however, by the appellant that this agreement was confirmed by her, after the bar of coverture was removed, and after she was more fully informed as to the legal effect of the agreement, and the evidence of this is the receipt of the 10th of December, 1894, signed by her four days after the funeral of her husband. It is not too much to say that this entire transaction leaves a painful impression upon the mind. Before the will is opened or read, the appellant, who was doubtless aware of the fact that he was named as the executor in the will, has a receipt carefully prepared by his attorney and goes to the widow with it in his possession to read the will. Before the will is probated, he offers her $500, on account of the legacy

therein contained, which is reluctantly accepted by her and the receipt signed. Whether she understood the contents of the receipt better than those of the agreement may be well doubted. Certain it is that within two days thereafter, after consultation with an attorney of her own choice, she repudiated it entirely and all that it implied, so far as the confirmation of the agreement of the 25th of September, 1894, was concerned. She offered to restore the status quo by giving her check for the amount which had been deposited to her credit by the check given in exchange for her receipt. This was as much as she could be in equity asked to do.

In the case of Shea's Appeal, 121 Pa. 302, the whole question of the doctrine of uberrima fides is exhaustively discussed. In the opinion delivered by Mr. Justice GREEN, page 318, he says: This "is not the case of a contract between strangers or of persons dealing at arms' length. It is not even the case of a contract between persons in a confidential relation but which, having been executed, carries with it the rights of one of the parties, so that relief can only be obtained by an affirmative and adverse proceeding and decree setting it aside on the ground of actual fraud. The right of the plaintiff to her assignment of dower is complete, without any reference to this contract. It comes into the case only as a defense against her claim, and the defendants must establish it, not only as a factum but as a bar to her claim, not assailable either by legal or equitable principles. Viewed in this light, it must endure successfully the test of those principles or it must fail. How is it in this respect? It is a contract between two persons, a man and a woman about to be married, and it relates to the future rights of the woman in the property of her husband. It is something to the purpose, though not of vital importance, that there was proof that two days before the marriage the plaintiff refused to sign such an agreement. True, she might have changed her mind and signed it nevertheless, but the duty to prove this and to prove it affirmatively and by satisfactory testimony, rests upon the defendants, and on the face of this record there is no such proof.

" There is, it is true, the legal inference of consent, which in all ordinary cases arises from mere execution. But in this class of cases that inference does not arise. The relation is

one of such extreme mutual confidence that a special duty of full disclosure arises which has no place in the ordinary contractual relation." With slight modifications this language applies to the case under consideration. The relation between husband and wife is more confidential, if possible, than that between parties contemplating the marriage relation. The agreement of the 25th of September, 1894, is set up as a bar to the statutory right of the widow to take $300, from her husband's estate. Under the facts in the case it became essential that the appellants should prove affirmatively and by satisfactory testimony that this agreement was executed under circumstances implying utmost good faith on the part of those securing its execution. We feel compelled to say that the overwhelming weight of the testimony shows the reverse. It is not necessary to multiply the citation of authorities upon this subject. The cases are largely those relating to antenuptial settlements. Prior to the act of 1893, herein discussed, it was practically impossible for a case such as the present to arise. If contracts such as this are to be considered as valid under the provisions of the act of 1893—and it is not to be understood that we give any intimation on this question—it will be incumbent upon the courts to apply the strictest scrutiny to the circumstances under which they are obtained.

In the view which we have taken of this case and discussed it, it is hardly necessary to refer to the question of the competency of the widow as a witness. It is not raised by the assignments of error. Objection was made to her competency before the auditor and her testimony was evidently considered by the court below. We have scarcely more than referred to her testimony, preferring to base our conclusion upon what was entirely undisputed in the case. We are of opinion, however, that as to anything which occurred in the presence of the son-in-law, Richards, or his wife or of Messrs. Serfass and Fenicle, or any of them, concerning which they testified, she was a competent witness under the provisions of the act of June 11, 1891, P. L. 287, and this practically covered all that was essential in her testimony.

We have not referred to the argument of the appellant in error that, even if the agreement should not be enforced as to Robert Odenwelder, it is good as between the widow and Mrs.

Richards. It is sufficient so far as this aspect of the case is concerned to say that, if voidable as to one, it is voidable as to both—that the influences which surrounded the execution of the agreement were such as to prevent its enforcement in equity as to any of the parties thereto.

This sufficiently disposes of all the questions involved in the case; and, for the reasons herein stated as well as for others which might be urged, we are of the opinion that the decree of the court below should be and it is hereby affirmed; the costs of the appeal to be paid by the appellant.