GILLETTE v. MITCHELL et al. (No. 7457.)

(Court of Civil Appeals of Texas. Galveston. June 21, 1918. Rehearing Denied Oct. 24, 1918.)

1. MINES AND MINERALS ⬤⟲77—OIL LEASES —JUDICIAL FORFEITURE.

Where an oil lease provided that the lessee would bring in a producing well within 11 months, and that within 30 days thereafter he should bring in another well and proceed with the same diligence until there should be at least five wells on the property, and that failure to prosecute the drilling should be construed as an abandonment of the lease other than as to producing wells, no judicial forfeiture was necessary where the lessee, after bringing in three producing wells, abandoned further operations.

2. MINES AND MINERALS ⬤⟲79(1)—OIL LEASES—RIGHT OF PARTIES.

Where plaintiff was entitled to one-fourth of the royalties from a well, she may adopt the arrangement made by her co-owners with the owners of another well as to the division of the proceeds of two wells, the oil from both being run into the same pipe line without being measured.

3. MINES AND MINERALS ⬤⟲47 — MINERAL OILS—OWNERSHIP.

Notwithstanding the fugitive nature of oil and that, like water in the earth, it belongs to the owner of the land under which it is found, a landowner who sinks a well on his land may acquire title to all the oil produced therefrom, regardless of the fact that it may be drawn from under the lands of adjoining owners.

4. MINES AND MINERALS ⬤⟲79(1)—MINING LEASE—SHARE IN ROYALTIES—DEVISEES.

Where a landowner, who had given an oil lease providing that, in event the lessee failed to develop, the lease should be forfeited, but the lessee should be entitled to retain any producing well and seven acres around the same, devised adjoining small parcels to plaintiff and defendant, and there was a producing well on the parcel devised to defendants, held that, after forfeiture of the lease, plaintiff was entitled to share in the royalties from the producing well, though it was located solely on the parcel devised to defendants; the chief value of the land being the oil thereunder.

Appeal from Harris County Court; W. E. Manteith, Judge.

Suit by Mrs. A. C. Gillette against Allen and Sidney Mitchell and another. From a judgment for defendants, plaintiff appeals. Reversed and rendered.

Pleasant F. Graves, of Houston, for appellant.

Baker, Botts, Parker & Garwood and R. C. Patterson, all of Houston, for appellees.

PLEASANTS, C. J. This suit was brought by appellant against Allen and Sidney Mitchell and J. C. Schilling to recover the sum

of $468.98, claimed by plaintiff as her part of money received by defendants as royalties from a joint indivisible oil lease covering adjoining tracts of land owned by plaintiff and the defendants Mitchell. The defendant Schilling was in possession of the fund as agent of defendants Mitchell and was therefore made a party defendant.

The controversy over the ownership of the royalties in question arises upon the following facts:

Mrs. Minnie Gaillard, who owned a tract of 42.2 acres of land on the William Scott survey in Harris county, executed on February 17, 1911, a lease of said land to S. J. Hindman for the development and production of oil and other minerals. Acting under this lease, Hindman developed a producing oil well prior to the death of Mrs. Gaillard, which occurred in September, 1913. The royalties accruing from this well under the terms of said lease constitute the fund in controversy. The land is situated in the Goose Creek oil field, and the lease provides for its forfeiture in event the lessee fails to diligently prosecute the development of the land for oil and minerals, but also provides that—

In such case "the lessee shall be entitled to retain this lease so far as it may relate to any well already drilled and to the seven acres around the same in a square form to be run with the cardinal points of the compass and with such well in the center and there shall be no forfeiture of this lease so far as relates to said seven acres as long as same shall produce oil in paying quantities and so long as the lessee shall operate the same agreeably to the terms of this contract."

At the time of Mrs. Gaillard's death, there were three producing wells on the property which had been brought in under the Hindman lease.

By her will, which was duly probated, Mrs. Gaillard devised separate small tracts of land out of the 42-acre tract to different members of her family.

The record does not disclose when the land was subdivided or platted into smaller tracts.

By the will a tract of two acres was devised to the defendants Allen and Sidney Mitchell, and a life estate in a tract of two acres to appellant. These two tracts adjoin each other. The first producing oil well brought in under the Hindman lease is situated on the Mitchell two-acre tract about 75 feet from the line of appellant's tract. The will makes no mention of the royalties from the oil wells.

By failure to diligently continue drilling and development operations, the Hindman lease became forfeited shortly after the death of Mrs. Gaillard, and under the clause of the lease above quoted the lessee retains and operates the producing well on the Mitchells' two-acre tract and also retains seven acres

of land in a square of which said well is the center. This seven-acre square includes four acres of land out of the forty-two acres of land, one acre of which is a part of the two-acre tract devised to appellant by Mrs. Gaillard.

Upon these facts, appellant claims a one-fourth interest in the royalties received from said well by the defendants since the death of Mrs. Gaillard, which share amounts to the sum of $2,048.78.

The cause was tried in the court below without a jury, and judgment was rendered in favor of defendants, that plaintiff take nothing by her suit.

The conclusions of law filed by the trial court bases the judgment in favor of defendants upon three grounds: First, that the petition fails to recite a cause of action; second, that the plaintiff failed to prove a forfeiture of the Hindman lease; and, third, that plaintiff failed to show the amount of money that had been received as royalties from the well on defendants' land.

[1] Under appropriate assignments of error, appellant assails each of these conclusions of the trial court. We agree with appellant that the undisputed evidence shows that, because of the failure of the lessee to use proper diligence to develop the property, all his rights under the lease had been forfeited except as to that portion of land included in the square of seven acres with the well for its center. No judicial forfeiture was shown. This was not necessary. The lease between Minnie Gaillard and S. J. Hindman of February 17, 1911, provided that the lessee would bring in a producing well in paying quantities within eleven months thereafter; and that within 30 days thereafter, that is, after bringing in this well, lessee should bring in a second well and proceed with the same diligence and in the same manner in the drilling thereof as in the case of the first well, and "so on, as in the case of the first and second wells, until there shall be at least five wells on said tract producing oil in paying quantities, or until the lessee shall decide to abandon the lease under the terms hereof." Paragraph V of said lease is, in part:

"And failure to prosecute the drilling with the diligence and in the manner hereinbefore provided shall be construed as an abandonment of this lease."

The lease further provides:

"Failure to operate any well for as many as twenty (20) days consecutively, or to prosecute the drilling on any well which is being drilled for as much as twenty (20) consecutive days except for necessary repairs, shall constitute a forfeiture of this lease."

The uncontradicted evidence shows that only three producing wells were brought in under this lease, and that all drilling under

the Hindman lease ceased shortly after the death of Mrs. Gaillard, and there has been no subsequent drilling under said lease. The assignees of the original lease and the owners of the property treated the lease as forfeited and entered into new leases for the development of the property.

We also think the undisputed evidence shows that the amount received by the defendants as royalties from the well in question amounted to the sum of $2,048.78.

[2] The evidence shows that the production from this well and from another well on the 42-acre tract which was being operated under the Hindman lease was, by agreement between defendants Mitchell and the owners of the tract on which the other well was situated, run into the same pipe line, and production from the two wells sold without being separately measured, and the proceeds of the sale equally divided between defendants Mitchell and the owners of the other well; the defendants' portion of said proceeds being the amount above stated. If appellant was entitled to one-fourth of these royalties, she can adopt the agreement made by the defendants Mitchell with the owners of the other well as to the division of the proceeds from the two wells, and she was not required to plead this agreement in order to hold said defendants liable for her portion of the money received thereunder by them.

[3, 4] The question of whether the fact that appellant's land is, under the terms of the lease executed prior to the time that she became the owner thereof, a part of the seven-acre tract upon which the producing well is located, entitled her to a proportionate part of the proceeds of the well, is one of difficulty and upon which there is no direct authority in this state. In Donahue on Petroleum and Gas, p. 216, the rule is thus stated:

"Under a devise of lands by a testator, where there was an outstanding lease, at the time of the devise, and active operations were prosecuted on one of the tracts of land devised, and oil was being produced, the devisees will share in proportion to the number of acres of land devised to each in all the royalty derived from the lease in force at the time of the death of the lessor; but the devisee is entitled to have the value of the rental for the land on which the oil is being produced, deducted from the royalties before a division is made."

In support of this rule the author cites Wettengel v. Gormley, 160 Pa. 559, 28 Atl. 934, 40 Am. St. Rep. 733, and the same case in 184 Pa. 354, 39 Atl. 57; also, Woodburn's Estate, 138 Pa. 606, 21 Atl. 16, 21 Am. St. Rep. 932. The authorities support the rule announced.

The facts in the Wettengel Case were that the owner of three adjoining farms containing 600 acres executed an oil lease covering all of the land. At the time of the owner's death there were producing oil wells on one of the farms which had been brought in under this lease. By his will the lessor devised one of the farms to each of his three children. The controversy arose over the claim of the devisee of the farm upon which the well was situated to all of the royalties accruing from the operation of the well. The trial court held that the several devisees were entitled to the royalties in the proportion which their several tracts of land bore to the 600 acres covered by the lease. In affirming the judgment of the lower court, the Supreme Court, after stating the facts and giving the terms of the lease, which were essentially the same as the lease in this case, says:

"The subsequent division of the body of land by the lessor could not divide or diminish the privileges of the lessee, or change his covenants. The lessee may locate his wells where he pleases, regardless of the interests of the devisees of his lessor. He may distribute them over the 600 acres, or locate them all on one of the divisions. He may crowd the lines of the adjoining divisions so as to enable him to draw the oil from them without drilling upon them, and in this manner deplete, ultimately, the whole territory by operations conducted on the farm of one of the devisees. It is well understood among oil operators that the fluid is found deposited in a porous sand rock, at a distance ranging from 500 to 3,000 feet below the surface. This rock is saturated throughout its extent with oil, and, when the hard stratum overlaying it is pierced by the drill, the oil and gas find vent, and are forced, by the pressure to which they are subject, into and through the well to the surface. After the pressure is relieved by the outflow, the wells become less active. The movement of the oil in the sand-rock grows sluggish, and it becomes necessary to pump the wells in order both to quicken the movement of oil from the surrounding rock, and to lift it from the chamber at the bottom of the well to the surface. An oil or gas well may thus draw its product from an indefinite distance, and in time exhaust a large space. Exact knowledge on this subject is not at present attainable, but the vagrant character of the mineral, and the porous sand rock in which it is found, and through which it moves, fully justify the general conclusion we have stated above, and have led to its general adoption by practical operators. For this reason, an oil lease partakes of the character of a lease for general tillage, rather than that of a lease for mining or quarrying the solid minerals. In the case of a coal lease, for example, the exact location, with reference to lines on the surface, of every pound of coal taken, may be easily determined. The stratum of coal is as fixed and permanent in its character as are the strata of superincumbent rocks and earth. Its ownership, as between several devisees or heirs at law after partition made, is as easily determined as that of the surface. The removal of the coal from one part does not diminish or disturb that which underlies another. The lines that divide the surface divide, with absolute fairness to all concerned, the subsurface, and secure to

the several owners, with certainty, the mineral that belongs to each. The rules applicable to coal leases, or leases of land containing any other solid mineral, are therefore not always capable of application to leases for the production of oil or gas, because of the difference between the solid and the fluid minerals, and because of the deficient conditions under which they are found and brought to the surface. There is in this state no precedent that we are constrained to follow, and we cannot find that the question has been decided in any other of the oil-producing states. We are in a position therefore to consider and determine it on principle. For the reasons now briefly outlined, we concur in the conclusions reached by the learned judge of the court below."

It is settled by the decision of our Supreme Court that notwithstanding the fugitive nature of oil, a fact of which it seems the courts uniformly take judicial knowledge, that like water in the earth it belongs to the owner of the land under which it is found, and that the landowner may by sinking a well on his land acquire title to all of the oil produced therefrom, regardless of the fact that it may be drawn from under the lands of adjoining landowners. Ry. Co. v. East, 98 Tex. 146, 81 S. W. 279, 66 L. R. A. 738, 107 Am. St. Rep. 620, 4 Ann. Cas. 827; Bender v. Brooks, 103 Tex. 329, Ann. Cas. 1913A, 559, 127 S. W. 168; Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989.

We do not think these decisions are controlling upon the question presented in this case. The general question of whether one landowner is entitled to damages for oil or water drawn from his land by a well sunk by an adjoining landowner on his own land is very different from the question of whether the owner of a part of a tract of land from which prior to his acquisition of title a third person had acquired from the former owner the exclusive right to take oil therefrom is entitled to his proportionate share of the oil so taken. The owner of land not burdened with a lease of this kind can protect himself from having his oil taken from his land by an adjoining landowner, but appellant cannot so protect herself. The evidence shows that the land involved in this case is situated in an oil field and its chief value is its oil-producing possibilities. When Mrs. Gaillard devised to appellant and appellees their several tracts of land burdened with the lease which gave to Hindman the right, by the operation of the well then producing oil from the large tract of which the two tracts constituted a part, to take all of the oil from said larger tract, we think the benefits as well as the burdens of this lease went proportionately to each of the tracts devised, regardless of whether the producing well was on the one or the other. Notwithstanding the adverse criticism of the decision of the Pennsylvania court in the Wettengel Case by the Supreme Courts of Ohio, West Virginia, and Indiana in the cases of Gas Co. v. Ullery, 68 Ohio St. 259, 67 N. E. 494, Rymer v. Oil Co., 54 W. Va. 530, 46 S. E. 559, and Fairbanks v. Warrun, 56 Ind. App. 337, 104 N. E. 983, 1141, we think the rule announced in the Wettengel Case is sound and should be applied in the instant case.

It follows from the conclusions above expressed that the judgment of the court below should be reversed, and judgment here rendered for appellant for her proportionate part of the money received by defendants as royalties from the well on defendants' land, and it has been so ordered.

Reversed and rendered.

GRAVES, J., not sitting.