# Wettengel *v.* Gormley, Appellant.

[Marked to be reported.]

*Devise—Oil and Gas Lease—Royalties—Will.*

Where three tracts of land, all subject to the same oil and gas lease, are devised respectively to the owner's three children, the royalties accruing under the lease are divisible among the three devisees, although all of the wells are sunk on one only of the three tracts.

Owing to the vagrant character of oil and gas, a lease of these substances partakes of the character of a lease for general tillage, rather than that of a lease for mining or quarrying the solid minerals.

Argued Nov. 10, 1893. Appeal, No. 303, Oct. T., 1893, by defendant, James T. Gormley, from judgment of C. P. No. 2, Allegheny Co., Jan. T., 1893, No. 346, on case stated in favor of Annie B. Wettengel. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ. Affirmed.

Case stated to determine ownership of royalties under oil lease.

The case stated was as follows:

" 1. James Gormley, of Chartiers township, Allegheny county, Pennsylvania, at and immediately before the time of his decease, was the owner in fee simple of that certain tract of land in North Fayette township, Allegheny county, Pennsylvania. [Here follows description.]

" 2. On July 14, 1888, said James Gormley made a lease of said premises to J. A. Tomlinson, of Beaver county, Pennsylvania, for the purpose and with the exclusive right of drilling or operating for petroleum oil or gas thereon. And the rights of said J. A. Tomlinson, under said lease, by various assignments and transfers, have become vested in J. M. Guffy and others, doing business as the Oakdale Oil Co.

" 3. Said James Gormley died on Oct. 1, 1890, having first made his last will and testament duly probated and registered in the register's office of Allegheny county, whereby he devised two hundred acres more or less of said six hundred acres to his son, James T. Gormley, in fee simple, and of the residue he devised two hundred acres more or less to his daughter, Annie B. Wettengel in fee, and the residue he devised to his daughter Mrs. Marie J. Lockhart in fee. [The will and lease were made part of the case stated.]

" 4. The holders of said lease have drilled wells under and in pursuance of said lease, all of which are located within the boundaries of that portion of said six hundred acres which by the last will and testament aforesaid was devised to the said James T. Gormley, and all of which said wells are producing oil. In addition thereto one well was drilled on thåt portion of said land devised to Mrs. Lockhart, which latter well was a dry hole, producing nothing.

" 5. Up to the date of this agreement said wells have produced in the aggregate 14,918 barrels of oil, and under the terms of the lease aforesaid one eighth thereof is payable as royalty, out of which royalty one third is payable to Mary Gormley, widow, as dower, and it was further provided in said lease that the lessee should pay the sum of one hundred dollars per month in advance, beginning with the date of said lease, so long as he kept said lease, until oil or gas should be found in paying quantities, after which payment was to be made by the royalty as aforesaid. The first oil under said lease was produced on the

—— day of ——, 1891, being since the death of James Gormley, at which time the payment of one hundred dollars per month ceased. By the terms of said lease the right was given to the lessee to use sufficient water from the premises necessary to operations thereon, the right of way over and across said premises to place of operating, together with the right of laying pipes to convey oil and gas from the said farm.

" 6. It is claimed by the plaintiff that she is entitled to a sum of money equal to the proportion which the area of the land devised to her as aforesaid bears to the whole amount of land included in the said oil lease, out of the oil produced as aforesaid, which for the purposes of this case is agreed to be in money value the sum of fifty-seven cents per barrel.

" 7. On the other hand it is claimed by the defendant that the plaintiff is not entitled to any part whatever of the production of oil from the premises devised to him as aforesaid.

" If the court should be of the opinion that, under the law and the facts hereinbefore stated, the plaintiff is entitled to recover, then judgment is to be entered in favor of the plaintiff and against the defendant for the aforesaid sum of two hundred and seven dollars ; otherwise judgment to be entered in favor of the defendant."

The lease referred to in the case stated was as follows :

" Memorandum of agreement made and entered into this 14th day of July, 1888, by and between James Gormley, of Chartiers township, Allegheny county, Pennsylvania, of the first part, and J. A. Tomlinson, of Beaver county, Pennsylvania, of the second part, Witnesseth : That the said party of the first part for the consideration, covenants, and agreements hereinafter mentioned, has granted, demised and let unto the party of the second part, his heirs and assigns, for the purpose and with the exclusive right of drilling and operating for petroleum oil or gas, with the right to sublet and subdivide :

" All that certain tract of land in North Fayette township, Allegheny county, Pennsylvania, bounded and described as follows, to wit: By lands of Abraham Bell, Fife, Donaldson, Putnam, Morrow, Lutz, and others, containing six hundred acres more or less, being all the lands of said James Gormley in North Fayette township aforesaid, upon which said land said lessee agrees to drill not less than six wells. If oil or gas be

found in paying quantities the second of said wells to be commenced within six months after completing the first, and one additional well to be commenced every six months until the six wells are drilled, provided gas or oil be found in paying quantities. The party of the second part, his heirs or assigns, to have and to hold the said premises for the said purpose only for and during the term of fifteen years from the date hereof. The said second party, in consideration of said grant and demise, agrees to give the party of the first part, the full equal one eighth part of all the petroleum oil obtained or produced on the premises herein leased, to deliver the same in tanks or pipe lines to the credit of the party of the first part. They further agree that if gas is obtained in sufficient quantities to utilize, the consideration in full to the party of the first part shall be five hundred dollars ($500) per annum for each and every gas well drilled on the premises herein described, if of sufficient pressure to guarantee the laying of pipe lines to convey it to market, payable in thirty days after the line is laid. The party of the first part grants the further privilege to the party of the second part of using sufficient water from the premises herein leased necessary to the operations thereon, the right of way over and across said premises to the place of operating, together with the right to lay pipes to convey all oil or gas from this farm, the right to remove any machinery or fixtures placed on the said premises by the said lessee, his heirs or assigns, provided that such removal shall not take place until all rents or royalties due under this lease have been fully paid. The said second party hereby agrees for himself, his heirs and assigns, to pay any damage done to growing crops by the laying of pipes by him, his heirs or assigns. It is also agreed between the parties hereto that should any well drilled by said party of the second part fail to produce gas or oil in paying quantities then and in that event said second party shall at his option be released from liability to drill additional wells, and in case he should so elect, he shall at once give said party of the first part notice of this fact, and thereupon all rights granted under this lease shall cease and determine so far as the same affects the land described except as to paying wells drilled and one hundred acres of land immediately adjacent and surrounding each of said wells. Three hundred feet each way surrounding the

buildings on said premises are hereby reserved from being operated by said second party unless said first party decides to have it drilled. Operations to be conducted so as to interfere the least with farming privileges. Said lessee further agrees to pay the sum of one hundred dollars per month in advance, beginning with the date hereof, so long as he occupies said premises, until gas or oil is found in paying quantities, after which payment is to be made as above provided. All gates and fences opened by said lessee, his heirs or assigns are to be kept in good order, and so used as not to injure or damage the land or crops thereon. Any increase of taxes occasioned by this lease to be paid by the lessee. All springs in use by tenants are to be protected from injury occasioned by operating under this lease. It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors and assigns."

After the devises above recited, testator left the residue to his three children to be equally divided between them.

The court entered judgment for plaintiff for $207, in the following opinion, after reciting the facts, by EWING, P. J.:

" The lessee paid the rental of $100 per month until he obtained oil in paying quantities. This rent was divided between James Gormley's devisees in proportion to their average, up to the time oil was obtained. Operations began after the death of James Gormley.

" The lessee, exercising his discretion, has drilled several wells, all but one of which are on the portion devised to James T. Gormley, the defendant. He is not bound under the lease to bore on any other portion of the land. The devisees on the other part of the land cannot bore for oil on their own land. They are bound to submit to passage over their land for pipes or access, and to all conditions of the lease. How should the oil or royalty be distributed?

" At first impression it would seem that it should belong solely to the owner of the portion on which it is brought to the surface; were it coal or iron ore or other substance similar, both law and equity would so award. But oil and gas are not produced solely, nor do they necessarily come, from beneath the surface where they are brought to light. It is a well-known fact, notorious to those familiar with it, that oil and gas brought

to the surface by one or a series of wells, come largely from surrounding territory,—that a few wells judiciously put down in a small space will usually drain a large extent of land, and exhaust the deposit far from the point at which the drill has struck the oil.

" A great value of the lease or grant in question lies in the fact that there is an exclusive right to take the oil and gas from this large tract of land, and that the grantor is only required to put down six wells in all, in his own location, and bide his time for exhausting the oil from the whole tract.

" To give the entire royalty to one of the devisees under these circumstances would be inequitable. We do not consider it to be the law governing the case. The whole tract when devised in severalty to the three, was burdened by this previous grant. It is a common burden. The benefits should be shared. Had there been a lease on the whole tract for ten years, the rent reserved being one half the grain raised on 150 acres, to be put in wherever the tenant chose on the whole tract, (he to have pasture, timber, meadow, building, etc., on the whole tract,) and the tenant in full possession should see fit to do all his cropping on the portion devised to Mrs. Wettengel—surely she would not be entitled to all the rent thus derived from the whole tract. Yet, it would be no more inequitable than to give all the royalty in the present case to one devisee. We do not see that it is important to determine whether this royalty be rent, or product, or a part of the land, or whether the contract be a lease or a grant of an interest in the land—the governing facts and the principles are the same.

" It may be, probably is, the fact, that there is a temporary inconvenience to the owner of the portion of the land on which the oil is brought to the surface. If so, there should be some reasonable allowance therefor, but that point is not suggested in the case stated, nor have we any information relative thereto.

" The oil furnished to the defendant as royalty on oil produced under the lease should be divided in proportion to the average held by each of the devisees."

*Error assigned* was entry of judgment as above.

*J. McF. Carpenter*, for appellant.—The lease is not a grant

of property in the oil, but merely a grant of possession for the purpose of searching for and producing oil: Barnhart v. Lockwood, 152 Pa. 82; Shepherd v. McCalmont Oil Co., 36 Hun, 37; Brandt v. McKeever, 18 Pa. 70; Duffield v. Hue, 129 Pa. 94; Duffield v. Rosenzweig, 144 Pa. 520; Union Petroleum Co. v. Bliven Petroleum Co., 72 Pa. 173; Bainbridge on Mines and Minerals, 246.

Oil in situ is part of the land. It only becomes personalty by severance. If the oil is part of the land until it is brought to the surface, it is very certain that the title to the oil under defendant's farm passed to him by devise from his father.

*J. S. Ferguson, E. G. Ferguson* with him, for appellee.—Oil and gas are minerals with peculiar attributes. They "may be classed by themselves, if the analogy is not too fanciful, as minerals feræ naturæ:" Natural Gas Co. v. DeWitt, 130 Pa. 235.

Their fugitive and wandering existence within the limits of a peculiar tract is uncertain: Brown v. Vandergrift, 80 Pa. 147.

The testator must be presumed to have recognized the probabilities of the existence of oil and gas under every part of his farm, and he certainly did not intend that any one of his devisees should take the whole of these substances to the exclusion of the others. In effect the Tomlinson lease was a sale of all the oil and gas within the limits of the leased territory: Stoughton's Ap., 88 Pa. 201.

OPINION BY MR. JUSTICE WILLIAMS, April 2, 1894:

The question raised by this appeal is both novel and interesting. It is presented upon the following facts: James Gormley was, in his lifetime, the owner of three contiguous farms containing together about six hundred acres. In July, 1888, he made an oil lease to Tomlinson covering all the land. It was to run for fifteen years, and reserved a royalty upon all the oil produced of one eighth. The lease gave the lessee the usual privileges upon the land, among which was the right to take water from any part of it, and to any extent needed in his operations; a right of way into, and over, the body of land; a right to lay pipe lines to conduct the oil from the wells. It concluded with the following stipulation: "It is understood between the parties to this agreement that all conditions be-

tween the parties hereunto shall extend to their heirs, executors and assigns." The lessor died in October, 1890. By his last will and testament he gave one of these farms to each of his three children in fee, making no mention of the lease which included them all. The devisees have entered into possession of their respective farms, under the will of their father, and each holds in severalty. The holder of the oil lease has meantime put down several oil wells and is producing oil therefrom; these wells happen to be on the farm devised to James T. Gormley, the defendant, and he claims the entire royalty.

The question is thus seen to be, who is entitled to the royalty reserved by the ancestor? Should it be divided between the three devisees in proportion to the acreage held by each, or should it be paid to James T. alone? The answer to this question must depend partly upon the character and legal effect of the lease, and partly on the nature of the product obtained under it. If the lease had been the ordinary agricultural lease, reserving a fixed annual rent payable in money, it would not be doubted that the fee descended to the devisees subject to the estate for years held by the tenant. The lessor could not change the rights of the lessee, or disturb his covenants, by a division of the land into parts and a devise of these parts to separate devisees. All the devisees together take the place of the devisor, and receive the rent due as an entire sum from the tenant. It would not matter that the grain was grown on one of the divisions, the grass upon another, while the third was unimproved and covered with forest, their interests would be several as to each other under the terms of the will, but as to the tenant they would be undivided under the terms of the lease made by their ancestor and covering the land at the time of his death. But this was not an agricultural lease, it was an agreement known as an oil lease; it conferred an exclusive right upon the tenant to take the oil that might underlie the whole six hundred acres, and gave him fifteen years within which to take it. It was in its legal effect a sale of the oil, for the removal of which, the surface, and the sub-surface, were subjected to the necessary servitudes.

The subsequent division of the body of land by the lessor could not divide or diminish the privileges of the lessee, or change his covenants. The lessee may locate his wells where

he pleases, regardless of the interests of the devisees of his lessor. He may distribute them over the six hundred acres, or locate them all on one of the divisions. He may crowd the lines of the adjoining divisions so as to enable him to draw the oil from them without drilling upon them, and in this manner deplete ultimately the whole territory by operations conducted on the farm of one of the devisees. It is well understood among oil operators that the fluid is found deposited in a porous sand-rock, at a distance ranging from five hundred to three thousand feet below the surface. This rock is saturated throughout its extent with oil, and when the hard stratum overlying it is pierced by the drill the oil and gas find vent, and are forced, by the pressure to which they are subject, into and through the well to the surface. After this pressure is relieved by the out-flow the wells become less active. The movement of the oil in the sand-rock grows sluggish, and it becomes necessary to pump the wells in order both to quicken the movement of oil from the surrounding rock, and to lift it from the chamber at the bottom of the well to the surface. An oil or gas well may thus draw its product from an indefinite distance, and in time exhaust a large space. Exact knowledge on this subject is not at present attainable, but the vagrant character of the mineral, and the porous sand-rock in which it is found, and through which it moves, fully justify the general conclusion we have stated above, and have led to its general adoption by practical operators. For this reason an oil lease partakes of the character of a lease for general tillage, rather than that of a lease for mining or quarrying the solid minerals. In the case of a coal lease, for example, the exact location, with reference to lines on the surface, of every pound of coal taken may be easily determined. The stratum of coal is as fixed and permanent in its character as are the strata of superincumbent rocks and earth. Its ownership as between several devisees, or heirs at law after partition made, is as easily determined as that of the surface. The removal of the coal from one purpart does not diminish or disturb that which underlies another. The lines that divide the surface divide, with absolute fairness to all concerned, the subsurface, and secure to the several owners, with certainty, the mineral that belongs to each. The rules applicable to coal leases, or leases of land containing any other solid mineral, are there-

fore not always capable of application to leases for the production of oil or gas, because of the difference between the solid and the fluid minerals, and because of the deficient conditions under which they are found and brought to the surface.

There is in this state no precedent that we are constrained to follow, and we cannot find that the question has been decided in any other of the oil producing states.

We are in a position therefore to consider and determine it on principle. For the reasons now briefly outlined, we concur in the conclusion reached by the learned judge of the court below.

The judgment is affirmed.