**McRAE et al. v. JAPHET et al. (No. 8587.)\***

(Court of Civil Appeals of Texas. Galveston. Jan. 17, 1925. Rehearing Denied March 5, 1925.)

**1. Mines and minerals ☞79(1)—Oil and gas lease held indivisible as respects division of royalty.**

Oil and gas lease by which lessees acquired title to "all" minerals in and under land *held* indivisible, so that lessees were under no obligation to divide royalties between assignees of lessor, and so that lessor retained only royalty right together with potential right to a reinvestiture.

**2. Mines and minerals ☞74—Indivisible nature of oil lease held not changed by provision therein permitting assignment of their interest by either party.**

Clause in single and indivisible oil and gas lease, reserving to either party privilege of assigning their estates either in whole or in part, *held* not to change indivisible character of

lease, nor were lessees' burdens under it enlarged by lessor's assignment of interests in his estate to different persons.

**3. Mines and minerals ☞79(1)—Intent that purchasers from lessor of portion of land covered by lease should receive all royalty oil coming from that portion held not inferable from form of deed.**

Form of warranty deeds by which lessor of 15 acres of oil and gas lands conveyed one tract 5 acres and another 10 acres, "subject to all terms and provisions of the oil lease," *held* not to warrant inference that parties intended that all of royalty oil of either separate portion should go exclusively to purchaser of that portion.

**4. Mines and minerals ☞79(1)—That successors to lessor's interest acquired rights by purchase rather than by will held not to affect their right to share in royalties.**

That successors to lessor's rights under oil and gas lease acquired their title to portion of land covered by lease by purchase rather than by will *held* not to affect their right to share in royalties.

**5. Mines and minerals ☞79(1)—Warranty in deed of lessor's interest under oil and gas lease held warranty of title to land, without reference to royalties reserved.**

Where one who had previously purchased from lessor one-third of land covered by oil lease, including right to royalties, purchased remaining two-thirds and immediately conveyed such two-thirds to third party by general warranty deed, *held* such warranty was only a warranty of title to land as it then stood, and had no reference to royalty to be paid under lease to lessor, and did not preclude such first purchaser as holder of one-third of total lease from claiming one-third interest in royalty oil produced on lands so conveyed.

**6. Mines and minerals ☞79(1)—Lessor's royalty held incorporeal hereditament, subject to distribution among his grantees under same rule as applied to agricultural leases.**

Oil and gas lease vesting in lessees' title to all oil royalties retained by lessor was an incorporeal hereditament, in nature of income or rental which should be distributed among grantees of lessor, under same rule as applies to agricultural or general tillage leases existing under like circumstances.

**7. Courts ☞95(1)—Rules arising from theory of drainage of oil held to apply in Gulf Coast region.**

Rules arising from theory of drainage of oil apply to cases arising in Gulf Coast region, though oil in that region is not universally found in porous sand rock.

Error from District Court, Harris County; J. D. Harvey, Judge.

Action by Chas. C. McRae and others against Dan A. Japhet and others. Judgment for defendants, and plaintiffs bring error. Reversed and rendered.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted April 22, 1925.

Vinson Elkins, Wood & Pollard and Chas. C. McRae, all of Houston, for plaintiffs in error.

Carlton & Meredith, of Houston, for defendants in error.

GRAVES, J. A statement of the cause as it comes here from the court below, adopted by defendants in error, is thus made in the brief of plaintiffs in error:

"Plaintiffs in error sued in the district court of Harris county to recover a one-third interest in a one-eighth royalty in the oil produced and to be produced from a 15-acre tract, covered by an oil, gas, and mineral lease, executed prior to the subdivision and sale thereof to plaintiffs and defendants in error. Plaintiffs in error purchased the north 5 acres of this tract, and the defendants in error the south 10 acres. There has been no development work or production except on the south 10 acres. The case was tried before the court without a jury on an agreed statement of facts, and judgment rendered for defendants in error, on the theory that where a tract of land covered by an oil and gas lease has been subsequently subdivided and sold, in case of production of oil upon any of said subdivisions thereof, the royalty should be paid to the owner of the particular subdivision upon which the wells are located.

"The following statement is submitted as setting forth the material evidence in the case:

"Wilbur Fisher and wife in December, 1915, executed an oil, gas, and mineral lease to the Producers' Oil Company on a certain 15-acre tract of land out of the William Bloodgood augmentation survey in a portion of what is now called the Barbers Hill oil field in Chambers county, Tex. Subsequent to the execution of this lease, Fisher, the original lessor, conveyed to Walter Keeble, one of the plaintiffs in error in this case, the north 5 acres of the 15-acre tract leased to the Producers' Oil Company, and Keeble in turn subsequently conveyed to Charles C. McRae, the other plaintiff in error in this case, an undivided interest in 3 acres out of this north 5 acres. About eighteen months after this first conveyance to Keeble of this 5 acres Fisher, the original lessor, conveyed to Walter Keeble the remaining south 10 acres of this 15-acre tract under said lease, and on the same date Keeble conveyed to Japhet, one of the defendants in this case, the land so conveyed to him.

"This lease on the 15 acres was held about six years after the date of same, by paying semiannual rentals amounting to $150 a year, which was prorated among the owners of the land in proportion to their acreage in the 15-acre tract, and this lease passed by several assignments to the present holder of same. Soon after drilling operations were begun on this property there were two producing wells brought in on the south 10 acres of the land purchased by Japhet, which wells are still producing oil. There has never been any drilling on the plaintiffs in error's north 5 acres out of this 15-acre tract, and the present owners of the lease refuse to make any promises in regard to development of the north 5 acres of this tract, and refuse to make any agreement about keeping separate the oil produced; if any,

on the north 5 acres of this tract from the south 10 acres of this tract. In other words, the lessees take the position that they hold an indivisible lease on this 15-acre tract of land, and, not only that the lease is indivisible, but that they only propose to pay one royalty on the entire 15 acres, and not two royalties, one on the 5-acre tract and the other on the 10-acre tract, claiming that it will entail considerable additional expense to them to either regard these two tracts as separate leases or to keep separate and apart royalty oil which may be produced on these two tracts.

"The agreement in regard to the facts being as follows:

"'That said operators, the Hindman Pugh Oil Company, have located their warehouse, office and pipeyard and drilling material upon plaintiffs' said 5 acres of land, and that the said operators (lessees) have never drilled and have not begun drilling any wells upon plaintiffs' said north 5 acres of land out of said 15-acre tract, and are not making any promises in regard to the future development of plaintiffs' said 5 acres of land, and that said operators claim that they are under no obligation whatever in regard to preventing the drainage from said 5-acre tract of land by reason of wells drilled and to be drilled upon the defendants' adjoining south 10 acres of said 15-acre tract of land, and that said operators are claiming that said lease is indivisible as to any operations on the whole 15 acres of land, and that they will not agree to keep separate the production from said north 5 acres and the said south 10 acres of said 15-acre tract of land. That said operating oil company claims that the operation of said 10-acre tract of land and said 5-acre tract as separate tracts would entail considerable extra expense upon their part, both as to the drilling of wells and accounting separately to plaintiffs and defendants as to the oil produced from their respective tracts of land, and said operators further claim that they are under no legal obligation to conduct their operations on said 5 and 10 acre tracts of land as separate tracts, and said operators refuse to make any agreement whatever in regard to drilling on said separate tracts of land, or in regard to keeping the oil separate on said 5 and 10 acre tracts, but claim that they are entitled to treat said 15 acres of land so covered by said lease the same as though said land was owned by one interest, as was the case when said original lease contract on said 15 acres of land was given.

"'It is further agreed herein that the principal value of the land is the minerals, and that until drilling began December, 1922, the owners of the land prorated the money rental paid.'

"The following is a copy of the material evitions of the lease contract from Fisher to Producers' Oil Co.:

"Exhibit A.

"'Know all men by these presents that Wilbur Fisher and Belle Fisher, husband and wife, of the post office of Cedar Bayou, state of Texas, hereinafter called lessor (whether one or more), for and in consideration of one hundred and fifty and no/100 ($150.00) dollars, cash in hand paid, receipt of which is hereby acknowledged, do hereby lease unto Producers'

Oil Company, a corporation of Texas, hereinafter called lessee, the following described land, situated in the county of Chambers, state of Texas (description omitted), for the purpose of prospecting for oil, gas and sulphur, and the production of the same therefrom, together with the exclusive right of ingress and egress at any and all times to prospect, drill, mine and otherwise operate hereunder, and the right to erect, maintain and remove all necessary or proper structures and appliances, including the right to pull the piping from wells, and to install, maintain and remove all tanks and other means of storage and all pipes and other means of transportation; and, subject to the royalties hereinafter mentioned, there is hereby granted and conveyed to said lessee all of the oil, gas and sulphur in and under said land.

"The royalties above mentioned shall be (a) on oil, a quantity equal to one-eighth of all produced and saved, the same to be delivered at the wells or to the credit of the lessor in the pipe line to which the wells may be connected; (b) on natural gas, at the rate of two hundred dollars per annum, payable quarterly, for each well producing gas exclusively, and from which gas is then being used or sold off the premises, it being understood that the lessor shall have the privilege, at the lessor's own risk and expense, of making connections and using gas from such wells free of charge for one dwelling on the said land; (c) on gas produced from oil wells, when such gas is used or sold off the premises, at the rate of ten dollars per annum for each well while the gas is being so used or sold, and when such gas is used for the manufacture of gasoline there shall be an additional payment at the rate of ten dollars per annum for each well while such gas is being so used for the manufacture of gasoline; and (d) on sulphur, at the rate of one dollar per ton for all mined and marketed from said land. But it is understood and agreed that the lessee shall have the free use of oil, gas, wood and water from said land for all purposes of development and operation.

"If operations for the drilling of an oil or gas well are not begun on said land (on or in the immediate vicinity as hereinafter defined) on or before the 22d day of December, 1916, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the credit of the lessor in the First National Bank at —— (which shall continue as the depository regardless of changes in ownership of the land) the sum of seventy-five dollars, which payment or tender may be made by the check or draft of the lessee, and however made, shall operate to confer on the lessor the privilege of deferring the time limit for six months from said date. Thereafter, in like manner and upon like payments or tender of said amount, the time limit may be further deferred for additional periods of six months successively provided always that this lease cannot be kept in force by such payments in the absence of drilling operations for a longer period than five years from the date last above set forth. But nothing in this paragraph contained shall obligate the lessee, against its wish or option, to make any such payment or to drill or otherwise carry on operations hereunder. And it is understood and expressly agreed that the consideration first recited in this lease, the down cash payment and the obligation of the grantee contained in the next ensuing paragraph hereof, shall be held to support and sustain not only the privileges granted to the date first written in this paragraph, namely, the date when this lease is to terminate unless an additional payment or tender is made, but also the lessee's option of extending that period from time to time, and keeping this lease in force as aforesaid, as well as any and all other rights and privileges conferred on the lessee by this instrument.

"'If, during the period of this lease or the extensions of the time limit for drilling, and within five years from the date last above set forth, and prior to the discovery of oil or gas on said land, there shall be drilled on adjacent land within 200 feet of any line of said leased land a well producing as much as 50 barrels of oil per day for thirty consecutive days, the lessee will, with reasonable diligence, begin and prosecute the drilling of a well on said leased land in a faithful effort to find and produce oil in paying quantities.

"'After operations for the drilling on an oil or gas well shall have been begun on said leased land (or on land in the immediate vicinity, as hereinafter defined), it shall not be necessary for the lessee to make any further payments in lieu of drilling operations as provided in the second preceding paragraph hereof in order to keep his lease in force; and during said period of five years drilling operations may be suspended from time to time, without terminating this lease, provided the lessee shall have paid or tendered, or shall then pay or tender, the amount hereinbefore mentioned for the then current period of six months, including the time of such suspension, and provided further that after such operations are so begun no such payment or tender shall be necessary when the operations are being carried on in good faith and the period of suspension is less than thirty days.

"'If the lessee shall sink a well or shaft and discover oil, gas or sulphur in paying quantities in or under the above-described land, then this lease shall remain in full force and effect for ten years from such discovery, and as much longer as oil, gas or sulphur shall be produced therefrom in paying quantities; and, having so discovered oil, gas or sulphur in paying quantities, the lessee shall be exempt from loss or forfeiture of this lease, in whole or in part, except after judicial ascertainment that the lessee has failed to perform its duty and discharge its obligations hereunder and a reasonable opportunity thereafter to prevent such loss or forfeiture, and in event of final loss or forfeiture, there shall be reserved to the lessee such producing well or mine with 10 acres of land surrounding the same to be designated by the lessee.

"'No well shall be drilled nearer than two hundred feet to any house or barn now on said land, unless by consent of the lessor, and nothing contained shall deprive the lessor of the full use and enjoyment of said land subject to the privileges and estate hereby granted, and when requested by the lessor the lessee shall bury its pipe lines so that they will not interfere with cultivation.

" 'If the interest owned by the lessor in said land is or shall prove to be less than the entire fee the royalties and moneys herein provided for shall be delivered or paid to the lessor in the proportion only that the interest of the lessor bears to the entire fee.

" 'If the estate of either party hereto is assigned—and the privilege of assigning in whole or in part is expressly allowed—the covenants hereof shall extend to the assigns and successive assigns, but no change in the ownership of the land or the rentals 'or royalties, by purchase or otherwise, shall be binding on the lessees until it shall have been furnished with notice and proper evidence of such change.

" 'In testimony whereof this instrument is signed this· the 22d day of December, 1915.
" 'Wilbur Fisher.
" 'Belle Fisher.'

"Plaintiffs and defendants in error entered into a written agreement whereby defendants in error were to receive and have paid to them by the lessee, free from any claim on the part of plaintiffs in error, two-thirds of all the royalty oil due from the producing wells on the south 10 acres of the 15-acre tract, and one-third of the proceeds from the royalty oil which was produced from said 10 acres was to be placed on deposit in the Houston Land & Trust Company, to be held in trust by said company pending the final settlement of the litigation between these claimants as to the ownership thereof. The Houston Land & Trust Company was made a party defendant to the suit, and answered that it held such funds, which at the time of the trial amounted to $4,445.07, subject to the orders of the court, and asking that title to said funds so placed in trust with it, together with all moneys to be so placed with it during the pendency of this suit, be adjudged as to the ownership thereof. Defendants below filed a general demurrer and general denial.

"Judgment was on June 19, 1923, rendered against the plaintiffs in error, that they take nothing by their suit, and that the Houston Land & Trust Company continue to hold said trust funds together with such additional deposits as might be made with it, during the pendency of this suit, until the final determination thereof, to which action the plaintiffs in error in open court excepted and gave notice of appeal."

In this court plaintiffs in error complain of the denial to them of any interest in the fund so impounded, contending that the one-eighth royalty on all oil produced and saved on the 15 acres, although brought to the surface through wells drilled on the south 10 acres only, should be prorated between the present owners of the two subdivisions of the whole tract in proportion to the acreage therein owned by each, that is, one-third and two-thirds, respectively, relying mainly, in so far as concerns the direct question of law presented, upon the cases of Gillette v. Mitchell, 214 S. W. 619, by this court, Wettengel v. Gormley, 160 Pa. 559, 28 A. 934, 40 Am. St. Rep. 733; Id., 184 Pa. 354, 39 A. 57, by the Supreme Court of Pennsylvania, and Higgins v. Cal. P. & A. Co., 109 Cal. 304, 41 P. 1087, by the Supreme Court of California.

We agree with them, reverse the judgment, and render the cause in their favor, principally upon these considerations and conclusions:

[1] (1) The lease given by the Fishers upon the 15 acres as a whole was an indivisible one, vesting on that date the title to all the minerals in and under the land 'in the lessee, and leaving in the lessors only the one-eighth royalty right, together with the potential right to a reinvestiture of their original estate in case of forfeiture or other termination of the lease. Tex. Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566; Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 255 S. W. 601; Munsey v. Marnet, 113 Tex. 212, 254 S. W. 311; Thomason v. Ham, 113 Tex. 239, 254 S. W. 316; Caruthers v. Leonard (Tex. Com. App.) 254 S. W. 779; Queen v. Turman (Tex. Com. App.) 257 S. W. 1092.

[2] (2) The single and indivisible nature of the lease was not changed, nor were the lessee's burdens under it—other than in respect to the mere added duty of recognizing their assignees as possessing such rights, and only such, as the lessors themselves had—enlarged by the assignment clause. Gillette v. Mitchell (Tex. Civ. App.) 214 S. W. 619; McCallister v. Texas Co. (Tex. Civ. App.) 223 S. W. 859; Hoffman v. Magnolia Pet. Co. (Tex. Civ. App.) 260 S. W. at page 952 (4); Wettengel v. Gormley, 160 Pa. 559, 28 A. 934, 40 Am. St. Rep. 733; Id., 184 Pa. 354, 39 A. 57; Cochran v. Gulf Co., 139 La. 1010, 72 So. 720; Cyc. vol. 27, 743.

[3] (3) Under the particular forms of the respective warranty deeds from the Fishers to Keeble, by means of which the subdivision of the 15-acre tract into 5 and 10 acre blocks was effected, no intent of the parties that all of the royalty oil coming from either separated portion should exclusively go to its purchaser is inferable, rather the contrary, since both refer to the outstanding common lease, and that to the 10 acres expressly binds its grantee to accept it, "subject to all the terms and provisions of the oil lease."

[4] (4) In these circumstances, the acquirement of the title to the subdivided tracts by deed rather than by will makes no difference in legal effect.

[5] (5) The general warranty in the deed to the 10 acres from Keeble to Japhet was only a warranty of the title to the land as it then stood, having no reference to the one-eighth royalty to be paid under the lease to the lessor Fisher, since the title to all the oil in the land had already been severed by the lease contract and vested exclusively in the lessee.

[6] (6) The royalty retained by the lessor in the kind of lease contract here involved is an incorporeal hereditament in the nature of income or rental from the land, and

should be distributed under the same rule as applies to an agricultural or general tillage lease existing in like circumstances. 93 Central Law Journal, p. 337, "The payment of Royalties To Successors In Interest to Lessors In Oil Leases," by D. Edward Greer; Wright v. Carter Oil Co., 97 Okl. 46, 223 P. 836; Work v. U. S. ex rel. Mosier, 261 U. S. 352, 43 S. Ct. 389, 67 L. Ed. 693; Wettengel v. Gormley and Gillette v. Mitchell, both supra.

From the foregoing it is apparent that this court is content to follow the doctrine of Pennsylvania and of Texas, as voiced in the cited cases of Wettengel v. Gormley from the former and Gillette v. Mitchell from the latter, notwithstanding the fact that a number of great courts from other states, as defendants in error so ably argue, have apparently held differently; no attempt is here made to reconcile these several deliverances, nor even to determine whether or not the equivalent of the same states of fact is so alike present in them as to make their holdings directly and unequivocally antagonistic, but the view is taken that, so far as Texas is concerned, the case of Gillette v. Mitchell, in which this court followed the rule obtaining in Pennsylvania, stands as the single determination by an appellate court in this state of the question there involved; in other words, it is not thought that the case of Hoffman v. Magnolia Petroleum Co., 260 S. W. 950, by the San Antonio Court of Civil Appeals, upon which defendants in error strongly rely, is in real conflict with it; presumably the San Antonio court did not think so either, since no reference in the opinion rendered about 6 years later is made to this court's holding. It is also noted that the Supreme Court, on June 12, 1924, granted a writ of error in this Hoffman Case. S. W. Adv. sheets No. 1, vol. 266.

It seems to us that the decision in the Hoffman Case turned upon the construction of the particular form of the deed there involved, which is unlike those here, the court in effect simply concluding that, under the language used, the parties must be held to have mutually intended that only the minerals in and under the specific interest conveyed should pass; there may also be other features leading to a distinguishment between the two cases, but, this one being deemed enough, in view of the discussion hereto appended, at this point the matter is not further gone into.

In elaboration of these conclusions, the written argument filed by counsel for plaintiffs in error so clearly and satisfactorily expresses our own views that, at the risk of undue extension, this much of it is adopted and incorporated as a part of this opinion:

"A reading of those cases, holding. that the royalty always belongs to the party owning the land upon which the wells are located, will

269 S.W.—53

clearly reveal that those decisions were based on the theory that a lease is a mere license or option for the purpose of prospecting the lessor's land, and that *no title* to the oil or other minerals passed to the lessee under the terms of the lease contract. The reasoning in those cases was based on the theory that the lessor owning the title to the oil, gas, and other minerals under his land was entitled to his part of all such as lessee brought to the surface from wells located upon his land. But as admitted by defendants in error, the Supreme Court of this state in the cases of Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989, and Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566, held that the title to the oil and gas passed to the lessee under the leases involved in those cases. In addition to those cases, the following cases have all further emphasized the rule that the title to oil and gas passes under lease contracts in Texas as to the lessee, viz. Texas Co. v. Nelson Davis et al., 113 Tex. 321, 254 S. W. 304, 255 S. W. 601; Munsey et al. v. Marnet Oil & Gas Co., 113 Tex. 212, 254 S. W. 311; Thomason et al. v. Ham, 113 Tex. 239, 254 S. W. 316; Caruthers v. Leonard (Tex. Com. App.; decided October 10, 1923) 254 S. W. 779.

"Defendants in error seek to draw a distinction in the form of the lease contract in the present case and the form of lease contracts in the cases above cited, repeatedly stating that the lessor in the present case *reserved title* to his one-eighth royalty, and quoting from the lease contract as follows: 'And, subject to the rights hereinafter mentioned, there is hereby granted and conveyed to lessee all of the oil, gas and sulphur in and under said land.' Plaintiffs in error claim that the phrase 'subject to' does not mean a reservation, but defendants in error contend that the clause, 'subject to the royalties hereinafter mentioned,' constitutes a reservation of title to the royalty. However, the Commission of Appeals of Texas, in the case above cited of Caruthers v. Leonard, 254 S. W. 779, decided this question exactly to the contrary to defendants in error's contention. In this case (Caruthers v. Leonard) the lease contract under consideration *was in exact form* with the lease contract in the present case. For the complete form of the lease contract in the present case, see plaintiffs in error's original brief, pages 5 to 9; for complete form of lease contract in case of Leonard v. Caruthers, see 236 S. W. 190 (where the case was first reported in the Court of Civil Appeals). A comparison of the form of these two leases will show that they are identical as to wording and even as to punctuation. So the terms of these two leases being exactly alike, and the case of Leonard v. Caruthers having been finally decided by the Commission of Appeals and approved by the Supreme Court, there remains but the question of determining what the court held in the case of Leonard v. Caruthers, which it would seem would absolutely settle the question of the construction of the lease contract in the present case. The court said with reference to the lease contract in the case of Caruthers v. Leonard, 254 S. W. 782 (in which Evans leased to Weir a certain tract of land) as follows: 'Such being the nature of the estate created by the Weir lease, until the happening

of an event by which that estate is determinable, *all the estate in the oil and gas and other minerals* [italics ours] was out of Evans after the execution of the Weir lease. All that remained to him was a mere possibility of reverter.'

"This holding in the case of Leonard v. Caruthers was reaffirmed in a later case by the Commission of Appeals decided February 6, 1924, of Queen v. Turman, as stated in syllabus, 'where a transfer of an interest in oil, gas, and minerals in land referred to a former lease as being valid, and the conveyance was made subject thereto, transferee acquired only a mere possibility of reverter in the oil, gas, and minerals in place in the ground,' and the report of this case shows that the Supreme Court approved of this holding. 257 S. W. 1092.

"In view of the apparently different theory held by the Texas and Pennsylvania courts, from the other states that have passed upon the question with reference to the title to oil, gas and other minerals after the execution of a lease similar to the one of the present case, it is submitted that further discussion of the cases from other states holding to the contrary would serve no useful purpose. The only cases in Texas bearing upon this proposition, as stated in the briefs of both parties, are the cases of Gillette v. Mitchell (Tex. Civ. App.) 214 S. W. 619, and Hoffman v. Magnolia Petroleum Co., 260 S. W. 950; the latter case having recently been decided by the San Antonio Court of Civil Appeals. With reference to the case of Gillette v. Mitchell, plaintiffs in error suggest that the late cases by the Supreme Court reaffirming the rule that the title to the oil, gas, and other minerals passed to the lessee under the present form of lease reinforces the logic of the holding in this case, which plaintiffs in error submit is and should be again declared to be the law in this state.

"[7] The other Texas case which touches upon the question of prorating royalty between owners of different tracts under the same lease, of Hoffman v. Magnolia Petroleum Co., plaintiffs in error submit, upon a consideration of the different state of facts, does not necessarily conflict with the holding of the case of Gillette v. Mitchell, and the inference might be indulged in that the San Antonio Court of Civil Appeals did not so consider, as no reference is made in this opinion to the case of Gillette v. Mitchell. There are several material distinctions that might be mentioned in this case decided by the San Antonio Court and the case of Gillette v. Mitchell, decided by this court; among them might be mentioned that the conveyance in the Hoffman Case was, as stated by the court, 'one-half interest in and to all of the oil, gas, and other minerals in and under and *that may be produced from* [italics ours] the following described land situated in Comanche county, Texas, to wit.' Plaintiffs in error concede that it is probable that an owner of a tract of land covered by a lease might sell off a part of the land and by proper terms assign his royalty on all the oil that might be produced *from wells located upon the land conveyed,* but neither of the conveyances now before this court contain such provisions. Again, in the Hoffman Case, the San Antonio court says

with reference to drainage that, 'the allegations as to the oil and gas being drained from the 90 acres is vague and indefinite,' while plaintiffs in error plead, and it is agreed in the present case, that the lessees refused to do any development upon plaintiffs in error's land, and that lessees claim they are under no obligation whatever in regard to preventing drainage from plaintiffs in error's 5 acres *by reason of wells drilled on the adjoining south 10 acres,* and that said wells drilled and to be drilled on the south 10 acres will drain oil from the north 5 acres owned by the plaintiffs in error.

"We do not agree with counsel for defendants in error as to their contention that the theory of drainage of oil as announced in the Wettengel Case from Pennsylvania should not apply to the Gulf Coast region, because the oil is not 'universally found in porous sand rock'; while it is true that it is not universally so found in the Gulf Coast region, yet it is frequently so found, and, even if found in loose sand or shale, we do not think that experience has indicated that the drainage would be any less than if the oil was found in porous rock. At any rate the courts of Texas have enforced the rule for protection of boundaries of adjoining properties based on the theory of the fugitive character of petroleum, which subject was mentioned in the recent case by the Supreme Court of Texas of Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566, in which case reference was made to the case of Gillette v. Mitchell, decided by this court. In the Hoffman Case the court further found that: 'The language of the conveyance is that the grantors convey to Hoffman the oil, gas, and other minerals *from* the 90 acres of land, followed by a description of the land by metes and bounds.' The complete form of the lease in the Hoffman Case is not set forth in the opinion, but the court states that the lessors executed a lease *reserving* a one-eighth of all the oil produced on the property, whereas the lease in the present case did not reserve anything, but under the terms of said lease the title to all oil and gas passed to the lessee upon the execution of said lease.

"There is no question but what if counsel for either side of this suit were given definite instructions as to the intention of the parties,' and were given an opportunity to redraft the conveyances under consideration in this case, they could much more clearly express what was intended,—but, standing on these instruments as drawn, whether wisely or not, the question now before the court is to construe them according to the language as used and the rules of law applicable thereto. Counsel for defendants in error in their brief say that, if plaintiff in error thought he was purchasing a one-third interest in the royalty in the whole fifteen acres, why did he not so specify. On the other hand, plaintiff in error says, if defendant in error in his purchase at the time intended his royalty assignment to apply exclusively to wells on the 10 acres he was purchasing, why did not he so specify? How easy it would have been in drawing the assignment of his royalty included in his deed, to have specified that there was assigned to him all of the royalty coming *from wells located upon his 10 acres,* instead of providing in his

assignment as stated: 'This conveyance is made by the said Walter Keeble, and accepted by the said Dan A. Japhet, his heirs and assigns, subject to all the terms and provisions of the oil lease on said land executed by Wilbur Fisher and wife, Mrs. Belle Fisher, to Producers' Oil Company, dated December 22, 1915, and recorded in volume 6, pages 129 et seq. of the deed records of Chambers county, Texas, to which reference is made, and all the rights, remedies, powers and privileges of the said Wilbur Fisher and wife under said lease, as to the above-described 10 acres, having been assigned and transferred to said Walter Keeble by contract of even date herewith the same are hereby conveyed by the said Walter Keeble to the said Dan A. Japhet.'

"At any rate, this assignment clause to Japhet's deed did not add any additional rights not already included in his warranty deed from Keeble as expressed in his deed preceding this assignment clause; the rule being as stated in 27 Cyc. p. 743: 'Where the owner of land executes a gas or oil lease covering the same, and subsequently conveys the land by an ordinary quitclaim or warranty deed, the grantee is entitled to the rents or royalties maturing after the conveyance.' So, just as though this assignment clause had not been added, the question is, What were the rights, powers, and privileges of Fisher, the original lessor and owner of this land, after the execution of the lease under consideration in which the title to all the oil, gas, and sulphur had passed to the lessee? Fisher only had a royalty right left which was personal property, and a possibility of reverter of the title to the minerals. He had previously conveyed the north 5 acres to the plaintiffs in error, which conveyance carried with it all his rights and privileges to the north 5 acres. So the defendants in error could not get Fisher's rights in so far as same did not conflict with his previous conveyance of the said north 5 acres to plaintiffs in error. Fisher, the original grantor, could not pass to the defendants in error any right with reference to the royalty under this 15-acre tract that would conflict with the royalty rights previously passed to the plaintiffs in error by virtue of the previous deed to the north 5 acres. So plaintiffs in error submit that, under these two conveyances, there was passed to the plaintiffs in error one-third of Fisher's royalty right, and to defendants in error the remaining two-thirds in this royalty right, which was an indivisible right as to the whole 15 acres; this being especially true, unless the lessees should see fit to recognize a division of their 15-acre lease, which they steadfastly refuse to do. In the conveyance above mentioned, there was no effort made to specifically limit the royalty right to oil produced only from wells on the specific tracts conveyed.

"As before indicated, this might have been done, but was not so done, nor is there anything in the record to indicate that such was the intention of the parties purchasing these tracts or the intention of Fisher, the original lessor and owner of these tracts, in conveying these subdivisions covered by this 15-acre lease. In this lease to the Producers' Oil Company it was provided that Fisher was to get a quantity of oil equal to one-eighth of all produced and saved, and to be delivered to him

in the pipe lines. This was the moving consideration of the transfer by him to the Producers' Oil Company, the original lessee, of all the oil and gas under the whole 15 acres. He had no right to dictate as to what part of the acreage wells were to be located on. Under the terms of the lease, it could not make any difference to Fisher as to where the wells were located. It cannot therefore make any difference to his vendees where the wells are located, since they could not acquire any rights or privileges that Fisher, the original lessor, did not possess. The one-eighth royalty applied to the whole 15-acre tract and was the consideration for the transfer of all the oil, gas, and minerals under the tract. Fisher could assign any part of this consideration, or royalty, a one-third, two-thirds, or other fractional interest therein, which is, of course, the usual way of assigning royalty, and is the only practical way from the standpoint of all parties, and plaintiffs in error contend that this is the kind of an assignment made by virtue of the conveyance before this court.

"The only suggested distinction offered by defendants in error, in seeking to distinguish the present case from the case of Gillette v. Mitchell and the Wettengel Case from Pennsylvania, seems to be that the owners of the respective tracts of land in these cases acquired title to same by devise, whereas the owners of the two tracts in the case now before the court acquired same by deed. This in a way is a distinction, but plaintiffs in error submit that it is a distinction without a difference. It is also true that in some of the other cases cited by defendants in error, in distinguishing their holdings from the Wettengel Case from Pennsylvania, mention is made that the Wettengel Case was where title was claimed under devise, whereas in the case decided title was acquired by deed. However, in none of these cases is there any attempted justification for drawing this distinction. It is possible to conceive how a court of equity in the construction of a will might, in trying to arrive at the intention of the testator with reference to several tracts of land devised, subject to a common lease, where there had been no production on any of these tracts before his demise, hold, where there was subsequently production on one of these tracts, that there was nothing to show that the testator intended to prefer one devisee above another, and that the royalty should be prorated equally between all the devisees of these tracts. But there was no situation of this kind in the case of Gillette v. Mitchell to influence the court to follow this line of reasoning, and evidently no reasoning of this kind was relied upon, because the court prorated the royalty between the owners of different tracts where there was production upon one of the tracts of these devisees prior to the time of the death of the testatrix. The case of Gillette v. Mitchell was decided by this court, not being unaware of the line of decisions relied upon and cited by defendants in error in this case, but was so decided because, as stated in the opinion of the court, 'we think the rule announced in the Wettengel Case is sound and should be applied in the instant case.'

"The assignment clause providing for assignment of the estate of either party is, plaintiffs in error submit, no authority for cutting up a

tract of land into separate parts so far as the lease is concerned. The 'estate' referred to could only mean the estate created by the lease contract, which was *the title to the minerals* in the lessee and *the royalty right* in the lessor, together with the estate of a possibility of a reverter, which means that the lessor could assign all his royalty right or any interest therein, or in addition to this he had the right to assign his estate of the possibility of a reverter. Of course the original lessor and owner of the land had the right to make as many subdivisions of the surface of his land as he chose; he did not have this right after the execution of the lease by virtue of the assignment clause in the lease, because the title to the surface of the land had not been conveyed to the lessee, and he did not have to get the lessee's consent to so convey his own land. However, this assignment clause could not authorize the original lessor to do anything that would make more than one lease out of this 15-acre tract of land so far as the lessee was concerned, nor more than one royalty right to be paid on this 15-acre lease.

"In addition to the cases cited on this proposition in plaintiffs in error's original brief, attention might be called to the following quotation from the case of Hoffman v. Magnolia Petroleum Co., cited by counsel for defendants in error, in which case the court in discussing the rights of lessor and lessee in an oil lease, stated: 'It is not alleged that appellants have requested the lessee of the land to sink wells on the 90 acres as offsets to wells dug near it, and bad faith or fraud on the part of the lessee was not alleged. There is no relation of trust or confidence existing between the lessor and lessee, and consequently none between appellants and the lessee. The lessee cannot be called upon to work in the interest of appellants and for the profit of the latter. The lessee cannot have a purchaser of mineral rights in a certain acreage of his leased lands forced on him, who would dictate to him as to the manner in which he should execute the terms of his lease. The purchaser occupies no better position than his vendor does. Colgan v. Forest Oil Co., 194 Pa. 234, 45 Atl. 119, 75 Am. St. Rep. 695.'

"Replying to defendants in error's proposition that one of the defendants in error, Keeble's warranty to Japhet, was a warranty that Japhet was to have one-eighth of the oil as royalty from wells located on the 10-acre tract conveyed by Keeble to Japhet, plaintiffs in error say that the warranty in this deed was only a warranty *to the title to the land,* and this one-eighth royalty to be paid to Fisher, the lessor, being no part of the land on account of the title to the oil having been severed by the lease contract and vested in the lessee (as held by the Texas cases hereinabove cited), *the royalty* was not included in Keeble's warranty to Japhet of the title to the land. In fact the warranty to this deed, even if the royalty was considered a part of the land, was qualified by the assignment clause added to the deed, which appears in full in this brief. In this assignment clause plaintiffs in error submit that it clearly appears that Keeble was only pretending to convey such rights to this 10 acres as he had acquired from Fisher by virtue of his deed from Fisher acquired on the same day as Keeble's deed to Japhet.

"While, as stated in the brief of defendants in error, in the case of Barnsdall v. Bradford Gas Co., 225 Pa. 338, 74 A. 207, 26 L. R. A. (N. S.) 614, the Pennsylvania court found the lease in this case vested in the lessee title to all of the oil and gas except the one-eighth thereof, the Texas courts have repeatedly stated that, under the form of lease contract now before the court in the present case, the lessee became vested with a determinable fee to *all* of the oil and gas. There might exist this difference between the Texas cases and the Pennsylvania cases as to the title to the royalty, but we think that, if there is such a difference in the holdings of these courts as to the title to the royalty, it is rather attributable to the difference in the forms of the contracts that have been before the courts, than to any difference as to the theory of the law. It does not appear that the lease contracts considered in the Pennsylvania cases attempted to convey *all* of the oil and gas, as does the lease contract in the present case. In fact, we think it is probable that, if a lease contract recited that the lessor retained title to one-eighth of the minerals (and many lease contracts in Texas are so drawn), such a lease contract would be construed by the Texas courts as reserving title in the lessor to one-eighth of the minerals. However, the language in the present lease contract before this court makes so apparent the application of the theory that the lessee becomes vested with a determinable fee to *all* of the oil and gas (as announced in the case of Leonard v. Caruthers, hereinbefore cited, and in other Texas cases), that further argument on this proposition would appear to be unnecessary.

"Counsel for plaintiffs in error, in conclusion, desire to make some further observations in regard to the reasons for the rule, as laid down in the Wettengel Case from Pennsylvania and in the case of Gillette v. Mitchell, decided by this court, that the royalty on subdivisions of a tract of land covered by a prior common lease should be prorated among the different owners of such tract in proportion to the acreage held by each. While the theory of drainage is relied upon as one of the principal reasons for such rule in these cases, the theory of drainage is by no means the only reason advanced for such holdings, though the drainage theory is especially applicable to the facts as admitted in the present case. As stated in the original brief of plaintiffs in error, one of the principal reasons for such holding is that under these forms of leases *all of the oil and gas* is conveyed to the lessee, and in addition to the cash consideration usually received on leases on small tracts in fields where there had been production, as in the present case, the contract provides for the payment of money rental for delay in operation, money rental on gas wells, and money rental on sulphur, and the payment by delivery to pipe lines of a percentage of the oil produced and saved, or as in the present lease, delivery of a *quantity of oil equal to one-eighth of the oil produced and saved,* not necessarily any part of the oil that was produced and saved from the leased tract, but a quantity of some oil of the same quality or market value to the pipe line, or the designated place that might be mutually agreeable to both parties, or, as is frequently the case, money in such an amount as will equal

the value of one-eighth of the oil produced and saved at the posted price of the grade of oil produced.

"This last consideration, generally called the royalty, is, of course, usually the moving consideration for the sale of *all* the oil and gas to the lessee under the premises, as well as the use of the *entire* premises in so far as same may be useful in the process of producing oil from any portion of said premises, and the *right to hold the entire premises* subject to the exclusive privilege of withdrawing from said premises all of the oil and gas therefrom. It is not only the value of the oil that an operator may be taking from some wells on a tract of land that gives the lease its real value, but very frequently the greatest value of a lease is the right of the operator to withdraw from other undeveloped portions of the leased premises all of the oil and gas thereunder as and when the operator may see fit. In other words, the exclusive right of holding oil in reserve on a lease is ofttimes worth many times the value of the oil that is being actually produced from wells on a small portion of the lease. So in the present case the exclusive right of the operator of holding in reserve all of the oil and gas under the entire acreage of this lease may be far greater than the value of the oil that is now being produced from the south 10 acres of this lease. The consideration, as stated, for all the oil and gas under this 15 acres of land, is the royalty now being paid, all of which defendants in error claim, because the wells happen to be placed on the south 10 acres of this 15-acre lease, and this, too, in the face of the Texas decisions that they do not own title to the oil under this south 10 acres, or even title to a one-eighth of the oil thereof which they are claiming.

"Plaintiffs in error submit that this is neither a legal nor an equitable claim, and, as before suggested in their original brief, the very most that it would seem that defendants in error could fairly claim for the use of their premises in withdrawing oil from thereunder, the title to which they do not own, would be the reasonable rental of the surface used in the operation, to be charged against the plaintiff in error; but this is not pleaded or claimed in the present case, and, besides, would be hardly fair, since it appears that plaintiffs in error's north 5 acres is being used by the operator in the process of the production from this lease. Another and equally as potent reason why the royalty on a tract of land subject to an existing lease thereon cannot be paid to the owner of each separate subdivision is, as before stated, that without his consent the lessee does not have to regard such subdivision and cannot be compelled to keep separate oil produced from various and perhaps very small subdivisions of a tract of land, nor be compelled to operate such tracts separately, nor be compelled to deal with various and different interests in cases where his original obligation is to pay one royalty applicable to the whole tract. The proposition of making several different royalty rights out of what was originally one royalty, and creating several estates out of what was originally one estate, is not authorized by the lease, and is a burden that cannot therefore be imposed upon the lessee.

"So, since this royalty was not payable by the acre and the owner of these two tracts purchased same burdened with the common lease, plaintiffs in error insist that the rule as laid down in regard to an agricultural lease under the same circumstances should apply in this case, as both royalty under an oil lease and rental under an agricultural lease are income from the land. The royalty accruing on this 15-acre tract of land was income from the use of the mineral resources of the land, just as agricultural rental would be, had there been an existing agricultural lease on this 15 acres of land when the parties to this suit purchased their respective tracts. Had there been an agricultural lease on this tract of 15 acres, the authorities are clear that the rental would be prorated between the owners of these respective tracts in the proportion to the acreage owned by each as compared to the whole acreage so covered by the agricultural lease. This would be true, even though all the crops were raised on the south 10 acres thereof and the north 5 acres remained unused. So royalty and rental both being income, one from the surface and the other from the minerals, there can be no good reason advanced why the same rule should not apply in the division of this income between the owners of these two tracts of land burdened by a common lease.

"That royalty is merely rental was stated by the Supreme Court of Oklahoma in the case of Wright et al. v. Carter Oil Co., 97 Okl. 47, 223 P. 836, as follows: 'In legal effect the bonus, rentals, *and royalty* [italics ours] accruing under said oil and gas lease are income from mineral resources. The Supreme Court of the United States has held that the bonus or down payment received by landowners at the making of a lease is to be treated as a royalty, for the reason that it is income from the use of the mineral resources of the lands —citing the case of Work v. U. S. ex rel. Mosier, 261 U. S. 352, 43 S. Ct. 389, 67 L. Ed. 693, in which case the court in discussing the nature of a bonus paid on Indian lands said: 'It was in effect a supplement to the royalties already determined. It was really part of the royalty or rental in a lump sum or down payment. We do not see how it can be classified as anything else. It was income from the use of the mineral resources of the land. Of course it involved a consumption and reduction of the mineral value of the land.; but so does a royalty. This is an inevitable characteristic of income from the product of the mine.' "

It follows that the trial court's judgment should be reversed, and that the cause should be rendered in favor of the plaintiffs in error, in accordance with the prayer in their petition below. It is so ordered.

Reversed and rendered.